UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
EMILY GILBERT,

                              PLAINTIFF,

                              -against-

STONY BROOK UNIVERSITY, ROBERT
REEVES in his individual and official capacity,
CARLA CAGLIOTI in her individual and official capacity,
and MAURIE MCINNIS, in her Official Capacity,

                              DEFENDANTS,

--------------------------------------------------------------------X

21-CV-2273

**Docket No.:**

**COMPLAINT**

### PRELIMINARY STATEMENT

Plaintiff alleges that, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. 2000c et seq.; 42 U.S.C. 1981; 42 U.S.C. 1983; the New York State Human Rights Law,

N.Y. Executive Law Section 290 et seq.; the First Amendment to the United States Constitution;

and any other cause of action which can be inferred from the facts set forth herein.

### JURISDICTION AND VENUE

1. This Court has original jurisdiction pursuant to 28 U.S.C. 1331 and 1343 and supplemental

   jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. 1367.

2. Plaintiff has fully complied with all the prerequisites of jurisdiction under Title VII of the

   Civil Rights Act of 1964: Jurisdiction of this Court over this action is proper under Section

   706 (f)(3) of Title VII, 42 U.S.C. 2000e 5(f)(3). A charge of discrimination was duly filed

   with the EEOC and a Right to Sue Letter was issued. This action is filed within 90 days

   thereof.

3. Venue is appropriate in this Court pursuant to 28 U.S.C. 1391, as to all actions comprising the claims for relief occurred within the jurisdiction of this judicial district and because one of more of the defendants resides within the jurisdiction of this judicial district within the meaning of 28 U.S.C. 1391.

## PARTIES

4. Emily Gilbert ("Gilbert" or "Plaintiff") is a resident of the State of New York and is over the age of 18.

5. Plaintiff was an Editorial Associate for The Southampton Review ("TSR") while employed by Stony Brook University.

6. Defendant Stony Brook University ("SBU" or "School Defendant") is located at 118 Administration Building Stony Brook, NY 11794.

7. Defendant Robert Reeves ("Reeves" or "Defendant Reeves") is the Associate Provost of Southampton Arts and was Plaintiff's supervisor. Upon information and belief Defendant Reeves is a resident of Suffolk County.

8. Defendant Carla Caglioti ("Caglioti" or "Defendant Caglioti") is the Executive Director of Southampton Arts and was Plaintiff's direct supervisor. Defendant Caglioti reports directly to Defendant Reeves.

9. Defendant Maurie McInnis ("McInnis" or "Defendant McInnis"), in her official capacity is the President of Stony Brook University.

### Additional Relevant Individuals

10. Amy  Hempel ("Hempel") is the former TSR Fiction Editor.

11. Cornelius Eady ("Eady") was the TSR Poetry Editor.

12. Lou Ann Walker ("Walker") is the Direct of the Master of Fine Arts Program at Stony Brook University and creator of TSR.

13. Dominique Barone ("Barone") is the United University Professions ("UUP") Professional Guidance Officer.

14. Julie Sheehan ("Sheehan") is a Director at Stony Brook University.

15. Nick Flynn ("Flynn") is a well-establish writer, playwright, and poet.

## EXHUASTION OF ADMINISTRATIVE REMEDIES

16. Plaintiff has exhausted her administrative remedies.

17. On July 17, 2020, Plaintiff complained to Barone for the first time. She corresponded further on multiple occasions with the Union representative.

18. On August 20, 2020, Barone directed Plaintiff to email the UUP chapter president to receive referrals to law firms if Plaintiff decided to pursue the legal resolution.

19. On September 11, 2020, Barone connected Plaintiff with the Chair of the Academic Grievance Committee, Josh Dabnau ("Dabnau").

20. On October 28, 2020, Plaintiff reached out to Labor Relations to initiate the process of filing a complaint against Defendant Reeves and Defendant Caglioti for creating a hostile work environment in retaliation for her engaged in protected activity.

21. On September 15, 2020, Dabnau stated that, "[while] what they are doing is unpleasant, [it] does not rise to the level of 'disciplinary action.' So unfortunately, I think we are stuck in the situation where you can only document, try to do your job, and let us know if anything else happens that would warrant meeting again." Josh Dabnau also advised that he could go to Labor Relations on Plaintiff's behalf to ask them to resolve the issue but that he feared that this could make the situation worse.

22. On October 6, 2020, Dabnau stated that he had brought the issue to Labor Relations on Plaintiff's behalf. Labor Relations stated that they were already aware of Plaintiff's situation. Further, Labor Relations was aware that Defendant Reeves and Defendant Caglioti had removed certain roles from Plaintiff's job even though Plaintiff had received positive evaluations on her performance.

23. On October 27, 2020, Dabnau advised that, while Plaintiff could file a formal complaint and allege a hostile work environment, Labor Relations was already aware of Plaintiff's situation and had deemed not to be a violation.

24. After the Grievance Committee failed to remedy Plaintiff's situation, on October 28, 2020, Plaintiff emailed Labor relations directly to initiate the process to file a formal complaint.

25. Eventually, after nearly two weeks of email correspondence to schedule a phone call, on November 13, 2020, Labor Relations informed Plaintiff that their office could not handle her complaint. Plaintiff was informed that the Office of Equity & Access was better suited to handle her complaint and that she should contact that office.

26. Finding no resolution from Stonybrook or her Union, Plaintiff filed with the Equal Employment Opportunity Commission on January 7, 2021.

27. Plaintiff received her Right to Sue letter via email on February 12, 2021 dated January 26, 2021.

## STATEMENT OF FACTS

**Employment History**

28. In February 2013, Plaintiff was accepted into the Master of Fine Arts ("MFA") Program at Stony Brook University ("SBU").

29. In 2014, Plaintiff became an Editorial Assistant for The Southampton Review ("TSR").

30. Also in 2014, Plaintiff was promoted to Graduate Assistant. Plaintiff had not been accepted into the program as a Graduate Assistant, but when a Graduate Assistant quit after the first semester, the program offered her his Graduate Assistant stipend because of how hard and efficiently Plaintiff worked to assist the program even when she was not officially working in the Graduate Assistant role.

31. In 2014, Plaintiff took a course entitled "Practicum in Publishing," during which she assisted with the editing and production of TSR.

32. From 2014 to December 2020, Plaintiff was a member of the administrative staff for the Southampton Writers Conference. Among other duties, Plaintiff assisted co-directors with the planning and execution of the Conference, oversaw major conference events, moderated conversations between guest speakers, and hosted panels on literary journal publishing.

33. From 2016 to December 2020, was a member of the administrative staff for the Creative Writing and Literature MFA Program. Among other duties, Plaintiff provided administrative support to the Executive Director and Associate Provost, assisted with executing special events for the Program, and contacted alumni in association with events and the TSR.

34. From 2014 through 2018, Plaintiff was an editorial assistant and managing editor of TSR. Her job duties included corresponding with contributors, copyediting and proofreading accepted work, assisting with the publishing practicum, planning and executing issue launches, tracking subscriptions and orders, applying for grants, organizing annual conference itineraries, processing payment forms, gathering printer bids, overseeing social media accounts, and other miscellaneous tasks.

35. From 2018 to December 2020, Plaintiff was the Editor-in-Chief of TSR. Her job duties included teaching a course entitled "Practicum in Publishing and Editing," soliciting and accepting work for the journal, creating the lineup for each issue and selecting artwork, meeting with the other editors, submitting work from TSR to annual awards anthologies, selecting contest winners, corresponding with contributors, copyediting and proofreading accepted work, planning and executing issue launches, tracking subscriptions and orders, applying for grants, organizing annual conference itineraries, processing payment forms, gathering printer bids, overseeing the social media accounts, and other miscellaneous tasks.

36. Throughout Plaintiff's employment with Stony Brook, she had autonomy and exercised her job duties with limited supervision until her complaints. Some examples of Plaintiff's accomplishments and responsibilities included the following:

- Planned an event with PEN America, *Epiphany*, and the Bennington Writing Seminars for 300+ people at the annual AWP conference in Portland, Oregon;

- Represented *The Southampton Review* independently at the AWP conference in San Antonio, TX, in 2020;

- Independently planned and executed events for Southampton Writers Conference attendees;

- Held one-on-one discussions with prospective students during Visiting Days;

- Met independently with MFA students in her office;

- Facilitated an MFA student activism group when Plaintiff was a staff member in 2017—neither Defendant Caglioti, Defendant Reeves, Lou Ann, nor anyone else ever stated they needed to be present at the meetings;

- Independently posted and removed content on social media platforms and the TSR website without any instruction or guidance about what to say or what to remove;

- Met independently with graduate assistants throughout the semester;

- Emailed contributors to *The Southampton Review* since 2018 without needing to have Plaintiff's correspondence approved;

- Worked with co-directors of the Southampton Writers Conference and BookEnds without first needing to ask her supervisor's permission to help them;

- Planned and executed TSR launches, solicited work for the journal, and taught the practicum in publishing and editing entirely independently since 2018;

**Prizes, Publications, and Appearances**

37. In 2011, Plaintiff was awarded the Robert Watson Literary Prize for Fiction by the *Greensboro Review*.

38. In 2013, Plaintiff was awarded the Deborah Hecht Memorial Prize for Fiction by Stony Brook Southampton MFA in Creative Writing & Literature.

39. Between 2011 and 2018, Plaintiff published eight writings in various reviews and journals.

40. Between 2016 and 2020, Plaintiff made appearances at numerous literary conferences.

**History of Systemic Discrimination and Abuses of Power at SBU**

41. Plaintiff's first introduction to TSR, and by extension SBU, was when she read "The Heights" by Mervyn Rothstein, which TSR had published. The story is blatantly sexist, which alarmed Plaintiff when she read the story as a prospective student. TSR's decision to publish "The Heights" signaled to her, as an incoming student, that there was not a culture at TSR or SBU  which was sensitive to how individuals would feel reading it.

42. While a student in the Master of Fine Arts ("MFA") Program, Plaintiff heard one of her male professors, during class, criticize an actress, saying that she could never be considered attractive because she was fat.

43. While a student, a male faculty member repeatedly made comments about Plaintiff's appearance, either about her hair or what Plaintiff was wearing, and would consistently stand too close to Plaintiff to the point where she would move a few steps away and he would close the gap. This continued when Plaintiff became a staff member.

44. While a student, a male faculty member kicked Plaintiff out his of class after Plaintiff went to his office to discuss his comments that sexism should not be addressed when it comes to creative writing. After Plaintiff complained to female faculty members,  instead of supporting her, she was told to apologize to get back into the class.  Plaintiff, feeling as if she had no choice, apologized to him but her first apology was not good enough for him. She then had to apologize again.  In the interim, this same male faculty member used the n-word in his email correspondence to Plaintiff to try to make some comparison/analogy in addressing her complaints.

45. While a staff member, Plaintiff had a white faculty member use the n-word in casual conversation with her and another faculty member. It was in the context of him explaining how his relatives still said the n-word. The fact he said the word in full without any hesitation was concerning.

46. While a staff member, and in front of a room filled with other faculty, a senior faculty member said to everyone present, "If Plaintiff would stop stuffing her face, I'd love to her what she thinks." While admittingly said in a joking matter, it shows a general lack of regard for others and about what may be a sensitive topic (e.g., weight).

47. Plaintiff recognizes that most of the abovementioned behavior may not be necessarily protected, but it demonstrates the culture of TSR and SBU.

**Engaged in Protected Activity**

48. As editor of TSR, Plaintiff published a poem in TSR's Winter/Spring 2019 issue written by Flynn entitled "ON THE ANNIVERSARY OF MY MOTHER'S SUICIDE MY DAUGHTER AND I TAKE THE C TRAIN TO THE MUSEUM OF NATURAL HISTORY."

49. On June 19, 2020, people on Twitter began to accuse Flynn of abusing his power and stature as an established writer to take advantage of women.

50. Both as a member of a worldwide community of writers and readers and as an editor of a literary journal, Plaintiff paid close attention these past few years as a number of literary institutions and publications have grappled with situations involving abuses of power by either contributors, employees, or those serving in the upper tiers of the organizations.

51. Accordingly, Plaintiff drafted an official statement that would come from TSR in support of those speaking out against Flynn. After Plaintiff drafted the statement, but before its release, Plaintiff submitted the statement to Eady and Hempel for feedback.

52. While Eady supported the statement, Hempel did not.

**Plaintiff Exercised Her First Amendment Freedom of Speech Rights**

53. Upon consideration of Hempel's feedback, Plaintiff decided to post her opinions on the matter using her personal Twitter account. Again, Plaintiff showed the tweets to Hempel

prior to posting to ensure that TSR and the other editors would not be implicated. On June 26, 2020, Plaintiff posted the tweets. Plaintiff's three tweets read as follows:

    a.  "As editor of the Southampton Review, I published one of Nick Flynn's poems. I've recently learned about the allegations of misconduct against him."

    b.  "I believe those who speak out against people in positions of power do so at unknowable cost. They must be supported."

    c.  "Nick Flynn's poem has been removed from The Southampton Review's website. I take full responsibility for this decision."

54. Twenty minutes after Plaintiff had posted the tweets, a mutual friend of Hempel and Flynn reached out to Hempel to inform her that Flynn had seen the tweets and was very upset. Four more people contacted Hempel to voice their surprise and displeasure with Hempel because they perceived Hempel to have agreed with Plaintiff's tweets.

55. On June 28, 2020, Hempel emailed to inform Plaintiff she felt the need to step down from her position because of the perceived connection between herself, TSR, and her tweets. Hempel also told Plaintiff that she recognized the need to say what Plaintiff did in her tweets, and that she needed to step down because individuals disagreed with Plaintiff's personal statements.

56. Starting July 11, 2020, Flynn sent five emails to Defendant Reeves, publisher of TSR and Plaintiff's boss, and Plaintiff.

    a.  First Email: Flynn's primary stated goal was to ask to have his poem put back on the TSR website. Additionally, Flynn accused Plaintiff's tweets, and, by extension, Plaintiff, as having caused him harm by propagating alleged misinformation. This was the only email to which Plaintiff responded. In brief, Plaintiff stated that she,

as editor of TSR, and the editorial staff were reviewing how best to handle the situation stemming from Fynn's poem. Plaintiff also refuted his claim that her tweets had caused him harm, or, at the very least, more harm than other tweets.

b.  Second Email: Flynn attacked Plaintiff's abilities as editor and again asks Plaintiff to put his poem back on the TSR website.

c.  Third Email: Flynn offers to correspond via phone instead of email.

d.  Fourth Email: Flynn requests that either Defendant Reeves or Plaintiff explicitly state the allegations against Flynn that justified Plaintiff's decision to pull the poem from the website.

e.  Fifth Email: Flynn states that he got off the phone with Defendant Reeves and that Defendant Reeves "is going to clear this up."

57. On July 13, 2020, Defendant Reeves, in a response to an email chain between he and Plaintiff, states that, on the phone call with Flynn, Defendant Reeves and TSR as a whole would review TSR's policies and protocols regarding publication and how they influence the broader community. Additionally, Defendant Reeves said that he valued Plaintiff's input and that they would meet to discuss further.

**Additional Complaints and Protected Activity**

58. Plaintiff drafted a complaint which she submitted to her employer about the discriminatory and harassing work environment. Plaintiff made this decision after Reeves asked for more information as to why she made the decision to post on her personal twitter.

59. Plaintiff entitled her complaint as her Letter of Accountability ("LoA") and outlined her numerous complaints and recommendations for remedying the environment at Stony

Brook. Plaintiff sees the LoA as her formal complaint to the administration about all of the culture, systemic discrimination and abuses of power Plaintiff had witnessed and experienced, both as a student and as an editor of TSR. The LoA outlines Plaintiff's decision regarding Flynn, what led her to make her decision, and suggestions on how to proceed.

60. On July 16, 2020, Plaintiff submitted her LoA to Defendant Reeves via email.

61. On July 17, 2020, Defendant Reeves emailed Plaintiff in response to the LoA. In relevant part, Defendant Reeves stated the following: (1) TSR must develop a decision-making process and policy regarding "archive management" (i.e., deciding which pieces stay on the TSR website); (2) concerning Flynn, Plaintiff's decision to pull Flynn's poem from the TSR website accurately reflected TSR's community values; (3) Plaintiff made it difficult for Defendant Reeves to defend the program because Plaintiff did not keep him in the loop when making her decisions to pull the article or post on twitter; (4) Defendant Reeves intends to assemble an advisory committee to develop the policy; (5) Defendant Reeves asked whether Plaintiff would like to submit her LoA to the committee for their review or whether Plaintiff would like to submit another document to assist with the policy formation.

62. On July 21, 2020, Plaintiff met with Defendant Reeves and Defendant Caglioti.  During this meeting, Defendant Reeves and Defendant Caglioti advised Plaintiff that she should be careful about what she posts on her personal twitter. However, they did not address her LoA/Complaint.

63. On August 18, 2020, Plaintiff met with Defendant Reeves and Defendant Caglioti. In relevant part, they informed Plaintiff that, in response to her decision to pull Flynn's poem,

a formal memorandum from the University's counsel will go in her permanent file. Plaintiff

sent it to the Union's Professional Grievance representative.

64. The formal memorandum ("Counseling Memo"), drafted by Defendant Reeves and

Defendant Caglioti, states, in relevant part, the following: (1) that Plaintiff had overstepped

the bounds of her position by failing to "[c]onsult with the appropriate faculty and program

leadership on development and implementation of editorial policies and decisions that

determine the basic identity of the magazine, [TSR]"; (2) that Plaintiff did not have the

unilateral power to pull Flynn's poem from the website; (3) Defendant Reeves and

Defendant Caglioti shall republish Flynn's poem on the website; (4) Defendant Reeves and

Defendant Caglioti shall conduct an expansive consultation with the faculty and program

leadership concerning how best to address the immediate problems.

65. On August 19, 2020, Plaintiff emailed Barone to discuss the Counseling Memo and how it

will impact her personnel file. She directed Plaintiff to contact the Union Chapter President

to acquire referrals for law attorneys with whom Plaintiff could consult about the issue.

66. On August 27, 2020, Plaintiff wrote a letter ("Response to Memo") to Defendant Reeves

and Defendant Caglioti in response to the Counseling Memo. Plaintiff responded with the

following points: (1) Plaintiff had stated in the LoA that a possible solution to the Flynn

issue would be to put Flynn's poem back on the website and to further consult with the

faculty and leadership to reach a decision; (2) Plaintiff restated her enthusiastic willingness

to engage in a discussion with faculty and leadership to develop policies and procedures to

review work; (3) Plaintiff did not make a *unilateral* decision to remove Flynn's poem from

the website. Plaintiff shared her tweets with Hempel before posting and she stated that she

was comfortable with her decision to post. In fact, Hempel agreed with the decision to

remove the poem from the website; (4) that, to Plaintiff's understanding, Hempel stepped down because of the people who had contacted her, and not because of what Plaintiff had posted. Defendant Reeves expressed to Plaintiff that he was displease with her response.

67. Between June 26, 2020 (the date when Plaintiff removed Nick Flynn's poem from the website) and July 16, 2020 (the date when Plaintiff submitted her complaint to Defendant Reeves), neither Defendant Reeves nor Defendant Caglioti contacted Plaintiff regarding *The Southampton Review*'s day-to-day editorial operations. As far as Plaintiff knew, Plaintiff could continue performing her job autonomously as she always had. It was not until July 27, 2020, (four business days after a July 21, 2020, meeting with Defendant Caglioti and Defendant Reeves about the contents of the LoA) that Plaintiff received the first communication from Defendant Caglioti limiting her ability to do her job.

68. It is clear to Plaintiff that Defendant Reeves was not happy that she submitted a lengthy complaint. In fact, during a meeting, he stated that he did not expect a "big document;" and that Plaintiff did not have to write a "big document" but that he just wanted some little things to get us through the day. He consistently said that he was not looking for a 21-page document. However, what they all ignore, is that this "document" was a complaint.

69. Instead of addressing her complaint, Defendant Reeves just told Plaintiff it could be discussed later but it is not his to address.

70. Both Defendant Reeves and Defendant Calglioti informed Plaintiff that they were unable to discuss the contents of her letter. Plaintiff was informed that her complaint/letter was with the President of Stonybrook. However, no one at Stony Brook discussed it either.

71. Aside from removing Flynn's poem, and writing the LoA, Plaintiff complained verbally throughout the many meetings that followed. Plaintiff was shut down at every step.

**Retaliation**

72. Beginning in July 2020, Defendant Reeves and Defendant Caglioti began limiting the broad discretion they had previously given Plaintiff and required that Plaintiff get approval from them before she made even minor decisions.

73. This was a drastic change from the autonomy that she had prior to making her complaints.

74. Some of the examples of the discretion, and lack of involvement of Plaintiff's superiors on day-to-day decision making prior to complaining include, but are not limited to, the following:

- Defendant Caglioti once commented that Plaintiff won the "prize" for not emailing her at all while she was out of the office on vacation. The fewer "problems" or "questions," Plaintiff brought to Defendant Caglioti the happier she was with her performance;

- Neither Defendant Reeves nor Defendant Caglioti expressed that they needed to be kept informed of the day-to-day editorial operations of *The Southampton Review*;

- Neither Defendant Reeves nor Defendant Caglioti had ever referred to www.thesouthamptonreview.com as a "digital archive" or stated prior to July 2020 that removing work from the website required a specific policy;

- Neither Defendant Reeves nor Defendant Caglioti reprimanded Plaintiff for removing the photos and biographies of everyone listed on the masthead on www.thesouthamptonreview.com;

- Neither Defendant Reeves nor Defendant Caglioti ever reprimanded Plaintiff for removing content from or adding content to www.thesouthamptonreview.com prior to the removal of Nick Flynn's poem;

- Neither Defendant Reeves nor Defendant Caglioti expressed that a faculty advisor needed to oversee Plaintiff's administering of the practicum;

- On November 16, 2019, Defendant Reeves wrote in an email stating that: "I was indeed able to rest last night, anxiety-free, completely confident that Plaintiff would orchestrate another wonderful evening of celebration for TSR. Brava!" Defendant Reeves had been unable to attend the launch of the latest issue of TSR and was expressing confidence that Plaintiff had done a good job running the event without his supervision.

75. The lack of supervision or need to micro-manage was the norm until Plaintiff engaged in protected activity.

76. Defendant Reeves and Defendant Caglioti began to micromanage many aspects of her job, which they had not previously done, **after** Plaintiff engaged in protected activity, removed Flynn's poem and wrote her Letter of Accountability.

77. Plaintiff voiced her concerns about this increased supervision to the Grievance Committee. For example:

    a. Defendant Caglioti prohibited Plaintiff from hosting informal check-ins with teaching assistants and other undergrad students. On September 14, 2020, Plaintiff had received approval from Sheehan. But Defendant Caglioti deemed that approval as insufficient.

    b.  Defendant Caglioti and Defendant Reeves required that Plaintiff get approval of the language Plaintiff used in an email to authors whom TSR were going to publish in TSR's Winter/Spring 2021 issue. Prior to her complaints, Plaintiff had the discretion to contact authors without approval.

78. Defendant Reeve sand Defendant Caglioti also made the decision to cancel publication of TSR Winter/Spring 2021 Issue.

79. The autonomy Plaintiff used to have is now compromised. Since the complaint, Plaintiff has:

- Had to ask her supervisor for approval before assisting with the Conference and BookEnds;

- Had to ask permission to run meetings with MFA students and graduate assistants;

- Had Walker attend meetings she ran with graduate assistants working on *The Southampton Review*;

- Had Lou Ann and Defendant Caglioti attend meetings she ran with the graduate assistants. In an email, Lou Ann presented this as though they were checking in with all faculty/staff who had been assigned to work with GAs (and this was reiterated at a faculty meeting later that same week), but Plaintiff knows for a fact that the meetings Plaintiff ran with the GA's were the only meetings Defendant Caglioti and Lou Ann checked-in with;

- Been asked to participate in a faculty reading of some kind every single semester since Plaintiff was first employed in 2016 *except* for the relevant semester;

- Had frequent meetings with Defendant Reeves and Defendant Caglioti about *The Southampton Review*, assigned special tasks pertaining to the self-study (in contrast, in prior years Plaintiff would meet with Defendant Reeves and Defendant Caglioti about TSR perhaps a total of three times, if that, and Plaintiff was rarely assigned special tasks or research by Defendant Caglioti). On more than one occasion Plaintiff verbalized that the meetings caused excess stress and Plaintiff found them difficult to get through. Plaintiff was reassured there would be fewer meetings; there were not, and in fact on more than one occasion Defendant Caglioti has discussed continuing to have frequent meetings with her;

- Been assigned busywork tasks (for example: Plaintiff was asked to research literary journals from other MFA programs; when Plaintiff presented Defendant Caglioti with her initial findings they were deemed inadequate and she sent Plaintiff an already-completed spreadsheet of the programs she specifically wanted her to look into—but since the spreadsheet was already completed, when Plaintiff questioned her about the data she wanted her to find, she said all Plaintiff had to do was just check through the spreadsheet and update. Plaintiff spent hours on her  initial research, which it turned out Defendant Caglioti did not even need;

- Been told that faculty advisors will be brought in to help her administer the practicum in publishing and editing—a class Plaintiff have taught for the past five semesters completely independently and with excellent student evaluations;

- Had her communications critiqued—Defendant Caglioti stated that one of Plaintiff's emails to Lou Ann was unprofessional, but when pressed she was unable to articulate how it was unprofessional except to say that Defendant Caglioti, herself, would not have sent the email and that it doesn't "serve [me] well";

- Been told that Defendant Caglioti would be consulting with Lou Ann about issues related to TSR. Since Plaintiff became editor-in-chief in 2018, Defendant Caglioti has never verbalized that she would be consulting with Lou Ann about anything TSR-related until these past several weeks;

- Been told that Plaintiff was unable to talk to graduate students about anything that is not directly related to TSR or her specific job duties;

- At a meeting in May 2020 with Defendant Caglioti, Defendant Reeves, Lou Ann, and Scott Sullivan, Plaintiff was told that TSR could continue on as planned (publishing the Winter/Spring 2020 issue, not needing to cut back on printing costs). This all changed drastically after Plaintiff sent her LoA in July and was then informed there would be a self-study. Suddenly, there were budget concerns where before there had been none;

80. The retaliation occurred on a daily basis.

81. Plaintiff could no longer handle the stress and hostile work environment. Plaintiff felt that her only option was to leave since her employer and Labor Relations did nothing to resolve the situation.

82. Plaintiff was constructively discharged on December 31, 2020.

**Emotional Damages**

83. As the retaliation continued, and the freedom to do her job diminished, Plaintiff's anxiety and stressed greatly increased.

84. Plaintiff sough professional medical help for the emotional damages she faced.

## CAUSES OF ACTION

### FIIRST CAUSE OF ACTION
### UNDER TITLE VII
### DISCRIMINATION
**(All Defendants)**

85. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

86. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964; 42 U.S.C. Section(s) 2000e et Seq., as amended, for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex.

87. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her sex, together with retaliation and constructive discharge.

### SECOND CAUSE OF ACTION
### UNDER TITLE VII
### RETALIATION
**(All Defendants)**

88. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

89. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be an unlawful employment practice for an employer:

> "(1) to…discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

90. Defendants engaged in an unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of her personal, public stance on sexual misconduct and abuses of power.

### THIRD CAUSE OF ACTION
### UNDER STATE LAW
### DISCRIMINATION
### (All Defendants)

91. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

92. Executive Law §296 provides that, "1. It shall be an unlawful discriminatory practice: '(a) For an employer or licensing agency, because of an individual's . . .sex. . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.'"

93. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her sex, together with retaliation and constructive discharge

### FOURTH CAUSE OF ACTION
### UNDER STATE LAW
### RETALIATION
### (All Defendants)

94. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

95. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

96. Defendants engaged in an unlawful discriminatory practice by retaliating, and otherwise discriminating against the Plaintiff because of personal, public stance on sexual misconduct and abuses of power.

**FOURTH CAUSE OF ACTION**
**UNDER FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION**
**RETALIATION**
**(Robert Reeves individually and in his Official Capacity, Carla Caglioti, individually and in her Official Capacity, and Maurie McInnis, in her Official Capacity)**

97. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

98. Plaintiff posted tweets on her personal twitter account.

99. Plaintiff made the conscious decision to post the tweets on her personal account instead of the official TSR account.

100.    Plaintiff's tweets concerned sexual misconduct and abuses of power; both are matters of public concern.

101.    Plaintiff exercised her right to free speech by posting tweets concerning sexual misconduct and abuses of power.

102.    Defendant Reeves and Defendant Caglioti began to restrict Plaintiff's autonomy at work only after Plaintiff posted the relevant tweets.

103.    Defendant Reeves, Defendant Caglioti and Defendant McInnis used Plaintiff's tweets to justify reducing her freedom and duties at work.

104.    These actions constitute violations of Plaintiff's Frist Amendment freedom of speech.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grants judgment against Defendant as follows:

a. Preliminarily and permanently enjoining Defendants from discriminating and retaliating against Plaintiff and other Defendant employees;

b. An award in Plaintiff's favor for back pay, front pay, compensatory damages, loss of earnings, and loss of professional opportunities in an amount to be determined at trial;

c. An award of special and punitive damages in an amount to be determined at trial;

d. An award of prejudgment and post-judgment interest as allowed by law;

e. An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

f. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues.

Dated:    Melville, New York
          April 23, 2021

By: _____
          Aneeba Rehman

Nadia M. Pervez
*Attorneys for PLAINTIFF*
Pervez & Rehman, P.C.
68 South Service Road, Suite 100
Melville, NY 11747
Tel: (631) 427-0700
 arehman@pervezrehman.com
 npervez@pervezrehman.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
EMILY GILBERT,

PLAINTIFF,                                  Docket No.:

-against-

STONY BROOK UNIVERSITY, ROBERT
REEVES in his individual and official capacity,
CARLA CAGLIOTI in her individual and official capacity,
and MAURIE MCINNIS, in her Official Capacity,

DEFENDANTS,

------------------------------------------------------------------X

**VERIFICATION**

STATE OF NEW YORK          )
                                          ss.:
COUNTY OF SUFFOLK          )

I, EMILY GILBERT, am the Plaintiff in the within action. I have read the foregoing Complaint
and know the contents thereof. The contents are true to her  own knowledge except as to matters
therein stated to be alleged upon information and belief, and as to those matters I believe them to
be true.

EMILY GILBERT

Sworn to before me on this _21_ day
of _April_ , 2021.

Notary Public

ANEEBA REHMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02RE6299943
Qualified in Nassau County
Commission Expires March 31, 2018 22