UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
EMILY GILBERT,

                              PLAINTIFF,                    **Docket No.: 21-CV-2273**
                                                            (BMC)

                            -against-                      **FIRST AMENDED**
                                                            **COMPLAINT**

STONY BROOK UNIVERSITY, ROBERT
REEVES in his individual and official capacity as
Associate Provost of Southampton Arts, CARLA CAGLIOTI
in her individual and official capacity as Executive Director of
Southampton Arts, and MAURIE MCINNIS, in her individual
and official capacity as President of Stony Brook University,

                            DEFENDANTS,

--------------------------------------------------------------------X

## PRELIMINARY STATEMENT

      Plaintiff alleges that, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. 2000c et seq.; 42 U.S.C. 1983; the New York State Human Rights Law, N.Y. Executive

Law Section 290 et seq. and any other cause of action which can be inferred from the facts set

forth herein.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction pursuant to 28 U.S.C. 1331 and 1343 and supplemental

    jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. 1367.

2. Plaintiff has fully complied with all the prerequisites of jurisdiction under Title VII of the

    Civil Rights Act of 1964: Jurisdiction of this Court over this action is proper under Section

    706 (f)(3) of Title VII, 42 U.S.C. 2000e 5(f)(3). A charge of discrimination was duly filed

with the EEOC and a Right to Sue Letter was issued on (insert date). This action is filed within 90 days thereof.

3. Venue is appropriate in this Court pursuant to 28 U.S.C. 1391, as to all actions comprising the claims for relief occurred within the jurisdiction of this judicial district and because one of more of the defendants resides within the jurisdiction of this judicial district within the meaning of 28 U.S.C. 1391.

**PARTIES**

4. Emily Gilbert ("Gilbert" or "Plaintiff") is a resident of the State of New York and is over the age of 18.

5. Plaintiff was an Editorial Associate for The Southampton Review ("TSR") while employed by Stony Brook University.

6. Defendant Stony Brook University ("SBU" or "School Defendant") is located at 118 Administration Building Stony Brook, NY 11794.

7. Defendant Robert Reeves ("Reeves" or "Defendant Reeves") is the Associate Provost of Southampton Arts and was Plaintiff's supervisor. Upon information and belief Defendant Reeves is a resident of Suffolk County.

8. Defendant Carla Caglioti ("Caglioti" or "Defendant Caglioti") is the Executive Director of Southampton Arts and was Plaintiff's direct supervisor. Defendant Caglioti reports directly to Defendant Reeves.

9. Defendant Maurie McInnis ("McInnis" or "Defendant McInnis"), in her individual and official capacity is the President of Stony Brook University.

**Additional Relevant Individuals**

10. Amy  Hempel ("Hempel") is the former TSR Fiction Editor.

11. Cornelius Eady ("Eady") was the TSR Poetry Editor.

12. Lou Ann Walker ("Walker") is the Direct of the Master of Fine Arts Program at Stony Brook University and creator of TSR.

13. Dominique Barone ("Barone") is the United University Professions ("UUP") Professional Guidance Officer.

14. Julie Sheehan ("Sheehan") is a Director at Stony Brook University.

15. Nick Flynn ("Flynn") is a well-establish writer, playwright, and poet.

## EXHUASTION OF ADMINISTRATIVE REMEDIES

16. Plaintiff has exhausted her administrative remedies.

17. On July 17, 2020, Plaintiff complained to Barone for the first time. She corresponded further on multiple occasions with the Union representative.

18. On August 20, 2020, Barone directed Plaintiff to email the UUP chapter president to receive law firm referrals if Plaintiff decided to pursue a legal resolution.

19. On September 11, 2020, Barone connected Plaintiff with the Chair of the Academic Grievance Committee, Josh Dabnau ("Dabnau").

20. On October 28, 2020, Plaintiff reached out to Labor Relations to initiate the process of filing a complaint against Defendant Reeves and Defendant Caglioti for creating a hostile work environment in retaliation for her engaged in protected activity.

21. On September 15, 2020, Dabnau stated that, "[while] what they are doing is unpleasant, [it] does not rise to the level of 'disciplinary action.' So unfortunately, I think we are stuck in the situation where you can only document, try to do your job, and let us know if anything else happens that would warrant meeting again." Josh Dabnau also advised that

he could go to Labor Relations on Plaintiff's behalf to ask them to resolve the issue but that he feared that this could make the situation worse.

22. On October 6, 2020, Dabnau stated that he had brought the issue to Labor Relations on Plaintiff's behalf. Labor Relations stated that they were already aware of Plaintiff's situation. Further, Labor Relations was aware that Defendant Reeves and Defendant Caglioti had removed certain roles from Plaintiff's job even though Plaintiff had received positive evaluations on her performance.

23. On October 27, 2020, Dabnau advised that, while Plaintiff could file a formal complaint and allege a hostile work environment, Labor Relations was already aware of Plaintiff's situation and had deemed not to be a violation.

24. After the Grievance Committee failed to remedy Plaintiff's situation, on October 28, 2020, Plaintiff emailed Labor relations directly to initiate the process to file a formal complaint.

25. Eventually, after nearly two weeks of email correspondence to schedule a phone call, on November 13, 2020, Labor Relations informed Plaintiff that their office could not handle her complaint. Plaintiff was informed that the Office of Equity & Access was better suited to handle her complaint and that she should contact that office.

26. Finding no resolution from Stonybrook or her Union, Plaintiff filed with the Equal Employment Opportunity Commission on January 7, 2021.

27. Plaintiff received her Right to Sue letter via email on February 12, 2021 dated January 26, 2021.

## STATEMENT OF FACTS

**Employment History**

28. In February 2013, Plaintiff was accepted into the Master of Fine Arts ("MFA") Program at Stony Brook University ("SBU").

29. In 2014, Plaintiff became an Editorial Assistant for The Southampton Review ("TSR").

30. Also in 2014, Plaintiff was promoted to Graduate Assistant. Plaintiff had not been accepted into the program as a Graduate Assistant, but when a Graduate Assistant quit after the first semester, the program offered her his Graduate Assistant stipend because of how hard and efficiently Plaintiff worked to assist the program even when she was not officially working in the Graduate Assistant role.

31. In 2014, Plaintiff took a course entitled "Practicum in Publishing," during which she assisted with the editing and production of TSR.

32. From 2014 to December 2020, Plaintiff was a member of the administrative staff for the Southampton Writers Conference. Among other duties, Plaintiff assisted co-directors with the planning and execution of the Conference, oversaw major conference events, moderated conversations between guest speakers, and hosted panels on literary journal publishing.

33. From 2016 to December 2020, Plaintiff was a member of the administrative staff for the Creative Writing and Literature MFA Program. Among other duties, Plaintiff provided administrative support to the Executive Director and Associate Provost, assisted with executing special events for the Program, and contacted alumni in association with events and the TSR.

34. From 2014 through 2018, Plaintiff was an editorial assistant and managing editor of TSR. Her job duties included corresponding with contributors, copyediting and proofreading accepted work, assisting with the publishing practicum, planning and executing issue launches, tracking subscriptions and orders, applying for grants, organizing annual

conference itineraries, processing payment forms, gathering printer bids, overseeing social media accounts, and other miscellaneous tasks.

35. From 2018 to December 2020, Plaintiff was the Editor-in-Chief of TSR. Her job duties included teaching a course entitled "Practicum in Publishing and Editing," soliciting and accepting work for the journal, creating the lineup for each issue and selecting artwork, meeting with the other editors, submitting work from TSR to annual awards anthologies, selecting contest winners, corresponding with contributors, copyediting and proofreading accepted work, planning and executing issue launches, tracking subscriptions and orders, applying for grants, organizing annual conference itineraries, processing payment forms, gathering printer bids, overseeing the social media accounts, and other miscellaneous tasks.

36. Throughout Plaintiff's employment with Stony Brook, she had autonomy and exercised her job duties with limited supervision until her complaints. Some examples of Plaintiff's accomplishments and responsibilities included the following:

- Planned an event with PEN America, *Epiphany*, and the Bennington Writing Seminars for 300+ people at the annual AWP conference in Portland, Oregon;

- Represented *The Southampton Review* independently at the AWP conference in San Antonio, TX, in 2020;

- Independently planned and executed events for Southampton Writers Conference attendees;

- Held one-on-one discussions with prospective students during Visiting Days;

- Met independently with MFA students in her office;

- Facilitated an MFA student activism group when Plaintiff was a staff member in 2017—neither Defendant Caglioti, Defendant Reeves, Walker, nor anyone else ever stated they needed to be present at the meetings;

- Independently posted and removed content on social media platforms and the TSR website without any instruction or guidance about what to say or what to remove;

- Met independently with graduate assistants throughout the semester;

- Emailed contributors to *The Southampton Review* since 2018 without needing to have Plaintiff's correspondence approved;

- Worked with co-directors of the Southampton Writers Conference and BookEnds without first needing to ask her supervisor's permission to help them;

- Planned and executed TSR launches, solicited work for the journal, and taught the practicum in publishing and editing entirely independently since 2018;

**Prizes, Publications, and Appearances**

37. In 2011, Plaintiff was awarded the Robert Watson Literary Prize for Fiction by the *Greensboro Review*.

38. In 2013, Plaintiff was awarded the Deborah Hecht Memorial Prize for Fiction by Stony Brook Southampton MFA in Creative Writing & Literature.

39. Between 2011 and 2018, Plaintiff published eight writings in various reviews and journals.

40. Between 2016 and 2020, Plaintiff made appearances at numerous literary conferences.

**History of Systemic Discrimination and Abuses of Power at SBU**

41. Plaintiff's first introduction to TSR, and by extension SBU, was when she read "The Heights" by Mervyn Rothstein, which TSR had published. The story is blatantly sexist, which alarmed Plaintiff when she read the story as a prospective student. TSR's decision

to publish "The Heights" signaled to her, as an incoming student, that there was not a culture at TSR or SBU which was sensitive to how individuals would feel reading it.

42. While a student in the Master of Fine Arts ("MFA") Program, Plaintiff heard one of her male professors, during class, criticize an actress, saying that she could never be considered attractive because she was fat.

43. While a student, a male faculty member repeatedly made comments about Plaintiff's appearance, either about her hair or what Plaintiff was wearing, and would consistently stand too close to Plaintiff to the point where she would move a few steps away and he would close the gap. This continued when Plaintiff became a staff member.

44. While a student, a male faculty member kicked Plaintiff out his of class after Plaintiff went to his office to discuss his comments that sexism should not be addressed when it comes to creative writing. After Plaintiff complained to female faculty members,  instead of supporting her, she was told to apologize to get back into the class.  Plaintiff, feeling as if she had no choice, apologized to him but her first apology was not good enough for him. She then had to apologize again.  In the interim, this same male faculty member used the n-word in his email correspondence to Plaintiff to try to make some comparison/analogy in addressing her complaints.

45. While a staff member, Plaintiff had a white faculty member use the n-word in casual conversation with her and another faculty member. It was in the context of him explaining how his relatives still said the n-word. The fact he said the word in full without any hesitation was concerning.

46. While a staff member, and in front of a room filled with other faculty, a senior faculty member said to everyone present, "If Plaintiff would stop stuffing her face, I'd love to her

what she thinks." While admittingly said in a joking matter, it shows a general lack of regard for others and about what may be a sensitive topic (e.g., weight).

47. Plaintiff recognizes that most of the abovementioned behavior, taken individually, may not be necessarily discriminatory, it demonstrates the culture of TSR and SBU.

**Plaintiff Engaged in Protected Activity**

48. As editor of TSR, Plaintiff published a poem in TSR's Winter/Spring 2019 issue written by Flynn entitled "ON THE ANNIVERSARY OF MY  MOTHER'S SUICIDE MY DAUGHTER AND I TAKE THE C TRAIN TO THE MUSEUM OF NATURAL HISTORY."

49. On June 19, 2020, people on Twitter began to accuse Flynn of abusing his power and stature as an established writer to take advantage of women.

50. Women came forward describing Flynn's womanizing behavior and actions which involved him using his power to derail womens' success in the literary world. He was accused of being a  known chauvinist who used his male power and male influencer in the literary world to harm women and prevent their growth in the literary field unless they played according to his rules.

51. As a member of a worldwide community of writers and readers and as an editor of a literary journal, Plaintiff paid close attention to how a number of other literary institutions and publications grappled with situations involving abuses of power by either contributors, employees, or those serving in the upper tiers of the organizations.

52. Plaintiff personally, and in her support of women and non-binary individuals, was objectively and subjectively offended by Flynn's publication because of how he allegedly treated females and non-binary people.

53. Plaintiff voiced her complaints and accordingly drafted an official statement that would come from TSR in support of those speaking out against Flynn and in furtherance of gender equality and empowerment of women and the non-binary.  After Plaintiff drafted the statement, but before its release, Plaintiff submitted the statement to Eady and Hempel for feedback.

While Eady supported the statement, Hempel did not.


**Plaintiff Exercised Her First Amendment Freedom of Speech Rights**

54. Upon consideration of Hempel's feedback, Plaintiff decided to post her  opinions on the matter using her personal Twitter account. Again, Plaintiff showed the tweets to Hempel prior to posting to ensure that TSR and the other editors would not be implicated. On June 26, 2020, Plaintiff posted the tweets. Plaintiff's three tweets read as follows:

  a. "As editor of the Southampton Review, I published one of Nick Flynn's poems. I've recently learned about the allegations of misconduct against him."

  b. "I believe those who speak out against people in positions of power do so at unknowable cost. They must be supported."

  c. "Nick Flynn's poem has been removed from The Southampton Review's website. I take full responsibility for this decision."

55. Twenty minutes after Plaintiff had posted the tweets, a mutual friend of Hempel and Flynn reached out to Hempel to inform her that Flynn had seen the tweets and was very upset.

Four more people contacted Hempel to voice their surprise and displeasure with Hempel because they perceived Hempel to have agreed with Plaintiff's tweets.

56. On June 28, 2020, Hempel emailed to inform Plaintiff she felt the need to step down from her position because of the perceived connection between herself, TSR, and Plaintiff's tweets. Hempel also told Plaintiff that she recognized the need to say what Plaintiff did in her tweets, and that she needed to step down because individuals disagreed with Plaintiff's personal statements.

57. Starting July 11, 2020, Flynn sent five emails to Defendant Reeves, publisher of TSR and Plaintiff's boss, and Plaintiff. The emails are summarized below:

   a. First Email: Flynn's primary stated goal was to ask to have his poem put back on the TSR website. Additionally, Flynn accused Plaintiff's tweets, and, by extension, Plaintiff, as having caused him harm by propagating alleged misinformation. This was the only email to which Plaintiff responded. In brief, Plaintiff stated that she, as editor of TSR, and the editorial staff were reviewing how best to handle the situation stemming from Fynn's poem. Plaintiff also refuted his claim that her tweets had caused him harm, or, at the very least, more harm than other tweets.

   b. Second Email: Flynn attacked Plaintiff's abilities as editor and again asks Plaintiff to put his poem back on the TSR website.

   c. Third Email: Flynn offers to correspond via phone instead of email.

   d. Fourth Email: Flynn requests that either Defendant Reeves or Plaintiff explicitly state the allegations against Flynn that justified Plaintiff's decision to pull the poem from the website.

e.  Fifth Email: Flynn states that he got off the phone with Defendant Reeves and that Defendant Reeves "is going to clear this up."

58. Once Plaintiff removed the poem, she was immediately subjected a hostile work environment created by Flynn but allowed to fester because of Reeve's inability or refusal to protect Plaintiff from Flynn's email tantrums.

59. On July 13, 2020, Defendant Reeves, in a response to an email chain between he and Plaintiff, states that, on the phone call with Flynn, Defendant Reeves and TSR as a whole would review TSR's policies and protocols regarding publication and how they influence the broader community. Additionally, Defendant Reeves said that he valued Plaintiff's input and that they would meet to discuss further.

**Additional Complaints and Protected Activity**

60. Plaintiff drafted a complaint which she submitted to her employer about the discriminatory and harassing work environment she experienced. Plaintiff made the decision to make this complaint after Reeves asked Plaintiff to explain why she posted statements relating to Flynn on her personal twitter.

61. Plaintiff entitled her complaint as her Letter of Accountability ("LoA") and outlined her numerous complaints and recommendations for remedying the environment at Stony Brook. In her LoA, Plaintiff  complains to the administration about the unlawful culture, systemic discrimination and abuses of power Plaintiff had witnessed and experienced, both as a student and as an editor of TSR. The LoA outlines Plaintiff's decision regarding Flynn, what led her to make her decision, and suggestions on how to proceed.

62. On July 16, 2020, Plaintiff submitted her LoA to Defendant Reeves via email.

63. On July 17, 2020, Defendant Reeves emailed Plaintiff in response to the LoA. In relevant part, Defendant Reeves stated the following: (1) TSR must develop a decision-making process and policy regarding "archive management" (i.e., deciding which pieces stay on the TSR website); (2) concerning Flynn, Plaintiff's decision to pull Flynn's poem from the TSR website accurately reflected TSR's community values; (3) Plaintiff made it difficult for Defendant Reeves to defend the program because Plaintiff did not keep him in the loop when making her decisions to pull the article or post on twitter; (4) Defendant Reeves intends to assemble an advisory committee to develop a policy; (5) Defendant Reeves asked whether Plaintiff would like to submit her LoA to the committee for their review or whether Plaintiff would like to submit another document to assist with the policy formation.

64. On July 21, 2020, Plaintiff met with Defendant Reeves and Defendant Caglioti. During this meeting, Defendant Reeves and Defendant Caglioti advised Plaintiff that she should be careful about what she posts on her personal twitter. However, they did not address her LoA.

65. On August 18, 2020, Plaintiff met with Defendant Reeves and Defendant Caglioti. In relevant part, they informed Plaintiff that, in response to her decision to pull Flynn's poem, a formal memorandum from the University's counsel will go in her permanent file. Plaintiff sent it to the Union's Professional Grievance representative.

66. The formal memorandum ("Counseling Memo"), drafted by Defendant Reeves and Defendant Caglioti, states, in relevant part, the following: (1) that Plaintiff had overstepped the bounds of her position by failing to "[c]onsult with the appropriate faculty and program leadership on development and implementation of editorial policies and decisions that

determine the basic identity of the magazine, [TSR]"; (2) that Plaintiff did not have the unilateral power to pull Flynn's poem from the website; (3) Defendant Reeves and Defendant Caglioti shall republish Flynn's poem on the website; (4) Defendant Reeves and Defendant Caglioti shall conduct an expansive consultation with the faculty and program leadership concerning how best to address the immediate problems.

67. On August 19, 2020, Plaintiff emailed Barone to discuss the Counseling Memo and how it will impact her personnel file. She directed Plaintiff to contact the Union Chapter President to acquire referrals for attorneys with whom Plaintiff could consult about the issue.

68. On August 27, 2020, Plaintiff wrote a letter ("Response to Memo") to Defendant Reeves and Defendant Caglioti in response to the Counseling Memo. Plaintiff responded with the following points: (1) Plaintiff had stated in the LoA that a possible solution to the Flynn issue would be to put Flynn's poem back on the website and to further consult with the faculty and leadership to reach a decision; (2) Plaintiff restated her enthusiastic willingness to engage in a discussion with faculty and leadership to develop policies and procedures to review work; (3) Plaintiff did not make a *unilateral* decision to remove Flynn's poem from the website. Plaintiff shared her tweets with Hempel before posting and she stated that she was comfortable with her decision to post. In fact, Hempel agreed with the decision to remove the poem from the website; (4) that, to Plaintiff's understanding, Hempel stepped down because of the people who had contacted her, and not because of what Plaintiff had posted. Defendant Reeves expressed to Plaintiff that he was displeased with her response.

69. Between June 26, 2020 (the date when Plaintiff removed Nick Flynn's poem from the website) and July 16, 2020 (the date when Plaintiff submitted her complaint to Defendant Reeves), neither Defendant Reeves nor Defendant Caglioti contacted Plaintiff regarding

*The Southampton Review*'s day-to-day editorial operations. As far as Plaintiff knew, Plaintiff could continue performing her job autonomously as she always had. It was not until July 27, 2020, (four business days after a July 21, 2020, meeting with Defendant Caglioti and Defendant Reeves about the contents of the LoA) that Plaintiff received the first communication from Defendant Caglioti limiting her ability to do her job.

70. It is clear to Plaintiff that Defendant Reeves was not happy that she submitted a lengthy complaint in the form of her LoA. In fact, during a meeting, Defendant Reeves stated that he did not expect a "big document;" and that Plaintiff did not have to write a "big document" but that he just wanted some little things to get us through the day. He consistently said that he was not looking for a 21-page document. Defendant Reeves and Defendant Calglioti clearly were not interested in addressing Plaintiff's complaints.

71. Instead of addressing her complaint, Defendant Reeves just told Plaintiff it could be discussed later but he was not in a position to address it, making it clear that Defendant Reeves would not be investigating.

72. Both Defendant Reeves and Defendant Calglioti informed Plaintiff that they were unable to discuss the contents of her complaint. Plaintiff was informed that her LoA was with the President of Stonybrook, Defendant McInnis. However, no one at Stony Brook discussed it, addressed, it or investigated it, either.

73. Aside from removing Flynn's poem, and writing the LoA, Plaintiff complained verbally throughout the many meetings that followed. Plaintiff was shut down at every step.

74. Plaintiff's complaints were never investigated. In fact, Flynn's emails were addressed quicker and more thoroughly than any of Plaintiff's complaints.

75. Defendants also posted Flynn's poem back on TSR's website. Additionally, they refused to allow Plaintiff to add an "Editor's Note" about the poem which is customary in the industry.  Essentially, Defendants silenced Plaintiff and disregarded her complaints.

**Retaliation**

76. Beginning in July 2020, Defendant Reeves and Defendant Caglioti began limiting the broad discretion they had previously given Plaintiff and required that Plaintiff get approval from them before she made even minor decisions.

77. This was a drastic change from the autonomy that she had prior to making her complaints.

78. Some of the examples of the discretion, and lack of involvement of Plaintiff's superiors on day-to-day decision making prior to complaining include, but are not limited to, the following:

- Defendant Caglioti once commented that Plaintiff won the "prize" for not emailing her at all while she was out of the office on vacation. The fewer "problems" or "questions," Plaintiff brought to Defendant Caglioti the happier she was with her performance;

- Neither Defendant Reeves nor Defendant Caglioti expressed that they needed to be kept informed of the day-to-day editorial operations of *The Southampton Review*;

- Neither Defendant Reeves nor Defendant Caglioti had ever referred to www.thesouthamptonreview.com as a "digital archive" or stated prior to July 2020 that removing work from the website required a specific policy;

- Neither Defendant Reeves nor Defendant Caglioti reprimanded Plaintiff for removing the photos and biographies of everyone listed on the masthead on www.thesouthamptonreview.com;

- Neither Defendant Reeves nor Defendant Caglioti ever reprimanded Plaintiff for removing content from or adding content to www.thesouthamptonreview.com prior to the removal of Nick Flynn's poem;

- Neither Defendant Reeves nor Defendant Caglioti expressed that a faculty advisor needed to oversee Plaintiff's administering of the practicum;

- On November 16, 2019, Defendant Reeves wrote in an email stating that: "I was indeed able to rest last night, anxiety-free, completely confident that Plaintiff would orchestrate another wonderful evening of celebration for TSR. Brava!" Defendant Reeves had been unable to attend the launch of the latest issue of TSR and was expressing confidence that Plaintiff had done a good job running the event without his supervision.

79. The lack of supervision or need to micro-manage was the norm until Plaintiff engaged in protected activity.

80. Defendant Reeves and Defendant Caglioti began to micromanage many aspects of her job, which they had not previously done, until **after** Plaintiff engaged in protected activity, removed Flynn's poem, wrote personal *tweets* and wrote her LoA.

81. Plaintiff voiced her concerns about this increased supervision to the Grievance Committee. For example:

   a. Defendant Caglioti prohibited Plaintiff from hosting informal check-ins with teaching assistants and other undergrad students. On September 14, 2020, Plaintiff

had received approval from Sheehan. But Defendant Caglioti deemed that approval as insufficient.

   b. Defendant Caglioti and Defendant Reeves required that Plaintiff get approval of the language Plaintiff used in an email to authors whom TSR were going to publish in TSR's Winter/Spring 2021 issue. Prior to her complaints, Plaintiff had the discretion to contact authors without approval.

82. Defendant Reeve sand Defendant Caglioti also made the decision to cancel publication of TSR Winter/Spring 2021 Issue.

83. The autonomy  Plaintiff used to have was gravely compromised. Since the complaint, Plaintiff has:

   • Had to ask her supervisor for approval before assisting with the Conference and BookEnds;

   • Had to ask permission to run meetings with MFA students and graduate assistants;

   • Had Walker attend meetings she ran with graduate assistants working on *The Southampton Review*;

   • Had Walker and Defendant Caglioti attend meetings she ran with the graduate assistants. In an email, Walker presented this as though they were checking in with all faculty/staff who had been assigned to work with GAs (and this was reiterated at a faculty meeting later that same week), but Plaintiff knows for a fact that the meetings Plaintiff ran with the GA's were the only meetings Defendant Caglioti and Walker checked-in with;

- Been asked to participate in a faculty reading of some kind every single semester since Plaintiff was first employed in 2016 *except* for the relevant semester;

- Had frequent meetings with Defendant Reeves and Defendant Caglioti about *The Southampton Review*, assigned special tasks pertaining to the self-study (in contrast, in prior years Plaintiff would meet with Defendant Reeves and Defendant Caglioti about TSR perhaps a total of three times, if that, and Plaintiff was rarely assigned special tasks or research by Defendant Caglioti). On more than one occasion Plaintiff verbalized that the meetings caused excess stress and Plaintiff found them difficult to get through. Plaintiff was reassured there would be fewer meetings; there were not, and in fact on more than one occasion Defendant Caglioti has discussed continuing to have frequent meetings with her;

- Been assigned busywork tasks (for example: Plaintiff was asked to research literary journals from other MFA programs; when Plaintiff presented Defendant Caglioti with her initial findings they were deemed inadequate and she sent Plaintiff an already-completed spreadsheet of the programs she specifically wanted her to look into.  Since the spreadsheet was already completed, Plaintiff questioned Defendant Caglioti as to what data Plaintiff was supposed to find. Caglioti made it clear that Plaintiff was being assigned busy work and menial and insignificant tasks. Plaintiff spent hours on her initial research, Defendant Caglioti did not even need;

- Been told that faculty advisors will be brought in to help her administer the practicum in publishing and editing—a class Plaintiff has taught for the past five semesters completely independently and with excellent student evaluations;

- Had her communications critiqued—Defendant Caglioti stated that one of Plaintiff's emails to Walker was unprofessional, but when pressed she was unable to articulate how it was unprofessional except to say that Defendant Caglioti, herself, would not have sent the email and that it doesn't "serve [her] well";

- Been told that Defendant Caglioti would be consulting with Walker about issues related to TSR. Since Plaintiff became editor-in-chief in 2018, Defendant Caglioti has never verbalized that she would be consulting with Walker about anything TSR-related until after her complaints;

- Been told that Plaintiff was unable to talk to graduate students about anything that is not directly related to TSR or her specific job duties;

- At a meeting in May 2020 with Defendant Caglioti, Defendant Reeves, Walker, and Scott Sullivan, Plaintiff was told that TSR could continue on as planned (publishing the Winter/Spring 2020 issue, not needing to cut back on printing costs). This all changed drastically after Plaintiff sent her LoA in July and was then informed there would be a self-study. Suddenly, there were budget concerns where before there had been none;

84. The retaliation occurred on a daily basis.

85. Plaintiff could no longer handle the stress and hostile work environment. Plaintiff felt that her only option was to leave since her employer and Labor Relations did nothing to resolve the situation.

86. Plaintiff was constructively discharged on December 31, 2020.

**Emotional Damages**

87. As the retaliation continued, and the freedom to do her job diminished, Plaintiff's anxiety and stressed greatly increased.

88. Plaintiff sought professional medical help for the emotional damages she faced.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### UNDER TITLE VII
**(Sex Discrimination Hostile Work Environment against Stony Brook University)**

89. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

90. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964; 42 U.S.C. Section(s) 2000e et Seq., as amended, for relief based upon the unlawful employment practices of Defendant Stony Brook University.

91. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex.

92. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her sex.

93. The mere presence of Flynn's publication was subjectively offensive to Plaintiff as it supported a male in a position of power who exhibited misogynistic, discriminatory,

harassing behavior and used his power in the industry to negatively impact females and non-binary people.

94. The Flynn publication demonstrated support for offensive conduct against Plaintiff's protected class and is both subjectively and objectively offensive and creates a hostile work environment.

95. After Plaintiff removed the publication from TSR's website, she was bombarded with discriminatory emails, questioning her authority, competence, and her support for women and non-binary people.

96. Defendant Reeves, a male, contacted Flynn and assured him he would smooth it over.

97. The aforementioned acts of the Defendant and it's agents and employees were permitted to continue unremedied for so long to amount to a discriminatory practice of the Defendants.

98. Defendant Stony Brook University's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex.

99. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss wages, loss of benefits, irreparable damage to her reputation, severe emotional distress,  loss of consortium, mental health problems and legal expenses to date, which all have caused permanent economic injury to be determined at trial.

**SECOND CAUSE OF ACTION**
**UNDER TITLE VII**
**(Retaliation and Retaliatory Hostile Work Environment against Stony Brook University)**

100.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

101.     Section 704(a) of the Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. §2000e-3(a).

102.     Plaintiff made formal and informal complaints to Defendant Stony Brook University's agents and employees concerning defendant's unlawful, discriminatory employment practices based on the hostile work environment and sex discrimination.

103.     As a result of Plaintiff's complaints, Defendant Stony Brook University's agents and employees took materially adverse actions against Plaintiff, including, but not limited to,  excluding Plaintiff from the customary faculty reading, having supervisors attend meetings held by Plaintiff, requiring Plaintiff to get approval for minor tasks, being incessantly criticized without having any feedback on how to improve, stripping her of her job duties and functions, creating a hostile work environment, preventing her from accepting work for the forthcoming issue of the journal, and constructive discharge.

104.     Further, Defendants failed to address Plaintiff's complaints and overtly told her they would not discuss them, and that she should not have complained.

105.     Defendant Stony Brook's adverse actions constituted retaliatory workplace harassment.

106.     Defendant Stony Brook's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

107.     Through the aforementioned acts and omissions, Defendant Stony Brook retaliated against Plaintiff and   created a hostile work environment for complaining about the pervasive discriminatory culture at Stony Brook University.

108.     The severe and pervasive hostile work environment that Plaintiff faced as a result of her internal complaints demonstrates a casual link between the protected activity and the retaliation Plaintiff suffered at the hands of Defendant.

109.     As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss wages, loss of benefits, irreparable damage to her reputation, severe emotional distress,  loss of consortium, mental health problems and legal expenses to date, which all have caused permanent economic injury to be determined at trial.

### THIRD CAUSE OF ACTION
### UNDER TITLE VII
### (Sex Based Discrimination Disparate Treatment against Stony Brook University

110.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

111.     Plaintiff was, at all relevant times herein, an employee of Defendant Stony Brook within the meaning of Title VII of the Civil Rights Act (42 U.S.C. §2000e- et seq).

112.     Title VII of the Civil Rights Act prohibits employment practices that discriminate against a plaintiff on the basis of their sex.  Plaintiff has been. The victim of unlawful discriminatory conduct in the workplace.

113.     Plaintiff is a member of a protected class.

114.     Plaintiff was qualified for her position at Stony Brook.

115.     Plaintiff was unlawfully and intentionally. Subjected to disparate treatment and was subjected to an adverse employment as a result of her sex.  Stony Brook's agents and

employees took materially adverse actions against Plaintiff, including, but not limited to, micromanagement, stripping her of her job duties and functions, creating a hostile work environment, preventing her from accepting work for the forthcoming issue of the journal, and constructive discharge.

116.    Other male employees similarly situated to the Plaintiff were treated more favorable and not subjected to those actions.

117.    Plaintiff complained about the publication of an author who was alleged to have derailed the careers of other women simply because they were women.  Plaintiff, in support of women coming forward to share their stories, decided to pull her support for the author and poem which was published. Rather than support Plaintiff and other women, Defendants gave Flynn, a male, a full and complete opportunity to have his poem reinstated in total disregard of the women he offended with his alleged discrimination, including Plaintiff.

118.    Defendant's actions were unlawful, intentional, willful and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex.

119.    As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss wages, loss of benefits, irreparable damage to her reputation, severe emotional distress, and legal expense to date, which all have cause permanent economic injury to be determined at trial.


**FOURTH CAUSE OF ACTION**
**UNDER NYSHRL**
**(For Sex Based Discrimination Hostile Work Environment Against Reeves, Caglioti, and McInnis )**

120.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

121.    Plaintiff was, at all times relevant herein, an employee of defendant Stony Brook within the meaning of the New York State Human Rights Law (N.Y. Exec. Law §290 *et seq.*).

122.    At all relevant times herein, Stony Brook is a covered employer pursuant to the NYSHRL.

123.    By and through their course of conduct as alleged above, the individual defendants Reeves, Caglioti and McInnis, willfully violated the NYSHRL, by subjecting Plaintiff to a hostile work environment, discriminating against Plaintiff, denying her equal terms and conditions of employment, failing to investigate the complaints outlined in her LoA, and materially altering the terms and condition of her employment because of her gender and sex.

124.    As a result of the aforementioned acts and omissions, these defendants violated Plaintiff's right to be free from discrimination and a hostile work environment, pursuant to NYSHRL.

125.    As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss wages, loss of benefits, irreparable damage to her reputation, severe emotional distress, and legal expense to date, which all have cause permanent economic injury to be determined at trial.

## FIFTH CAUSE OF ACTION
## UNDER NYSHRL

### (For Retaliation Against Reeves, Caglioti, and McInnis )

126.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

127.     As a result of the aforementioned acts and omissions of the Defendants Reeves, Caglioti and McInnis unlawfully retaliated against plaintiff in violation of the NYSHRL.

128.     Defendants Caglioti and Reeves retaliated against Plaintiff by making Plaintiff's job impossible to perform after she had filed a complaint regarding the pervasive culture of sex discrimination in the department.

129.     As a result of Plaintiff's complaints, Defendants took materially adverse actions against Plaintiff, including but not limited to, excluding Plaintiff from the faculty reading, having supervisors be required to attend meetings held by Plaintiff, requiring Plaintiff to get approval for minor tasks, being incessantly criticized without having any feedback on how to improve, stripping her of her job duties and functions, creating a hostile work environment, preventing her from accepting work for the forthcoming issue of the journal, and constructive discharge.

130.     Furthermore, although made aware of her complaints through the LoA, Defendants did not investigate, discuss and even expressed their displeasure that Plaintiff made any complaints of discrimination.

131.     Upon information and belief, Defendants Reeves, McInnis and Caglioti's retaliation against Plaintiff was negligent and in violation of federal and state law.

132.     As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and will continue to sustain economic injury in the form of loss wages, loss of benefits, irreparable damage to her reputation, severe emotional distress,  loss of consortium, mental health problems and legal expenses to date, which all have caused permanent economic injury to be determined at trial.

## SIXTH CAUSE OF ACTION
## UNDER 42 U.S.C. §1983

**(Against  Defendants Reeves, Caglioti, and McInnis)**

133.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

134.    Plaintiff has a constitutionally protected property and liberty interest in continued employment with the Defendants free of unconstitutional harassment and/or retaliation under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Plaintiff has a First Amendment Right to Free Speech.

135.    Defendants Reeves, Caglioti and McInnis are "persons within the meaning of Section 1983.

136.     Defendants Reeves, Caglioti and McInnis were at all times state actors and acted under the color of law and in their official capacity, when committing the aforementioned acts of harassment and retaliation.

137.    There is such a close nexus between the State and the challenged action that the behavior of these defendants Reeves, Caglioti and McInnis may be fairly treated as the state itself.

138.    Defendants Reeves, Caglioti and McInnis were Plaintiff's supervisors, and each were personally involved in the actions, inactions, decisions, treatment, mistreatment, harassment and/or retaliation of the Plaintiff as set forth herein.

139.    By and through their course of conduct as alleged above, Defendants Reeves, Caglioti and McInnis violated 42 U.S.C. §1983 by allowing Plaintiff to be subjected to as hostile work environment, retaliating against Plaintiff, and materially altering the terms and conditions of her employment because of her gender, and thereby depriving her of the equal protection of the laws under the Fourteenth Amendment to the United States Constitution. These acts constitute violations of the Fourteenth Amendment to the

Constitution and are actionable pursuant to 42 U.S.C. §1983, in that the actions taken herein by defendants were intended to deprive Plaintiff of her rights guaranteed to by applicable and known federal law and were done by defendants under the color of state law. Defendants violated Plaintiff's rights by engaging in a course of conduct intended to injure the Plaintiff and which was unjustified by any legitimate governmental interest.

140.    By and through their course of conduct as alleged above, Defendants Reeves, Caglioti, and McInnis also violated 42 U.S.C. §1983 by allowing Plaintiff to be subjected to as hostile work environment, retaliating against Plaintiff, and materially altering the terms and conditions of her employment because of her gender, and thereby depriving her of the right to free speech of posting tweets on her personal account concerning misconduct and abuses of power against women.

141.    As a direct and proximate result of Defendants Reeves, Caglioti, and McInnis' unconstitutional conduct, Plaintiff was subject to a deprivation of rights, privileges and/or immunities secured by the Constitution, federal law, and the laws of New York State, and has been damaged thereby in violation of 42 U.S.C. § 1983.

142.    Defendants Reeves, Caglioti, and McInnis' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' rights.

143.    As a direct and proximate result of Defendants Reeves, Caglioti ,and McInnis' unconstitutional conduct, Plaintiff has sustained and will sustain economic injury in the form of loss of wages, loss of benefits, irreparable damage to her reputation, severe emotional distress, loss of consortium, mental health problems and legal expenses to date, which all have cause permanent economic injury to be determined at trial.

**EIGHT CAUSE OF ACTION**
**UNDER TITLE VII**

## CONSTRUCTIVE DISCHARGE
### (Against Defendant Stony Brook)

144.     Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

145.     Plaintiff was, at all times relevant herein, an employee of defendant Stony Brook University, within the meaning of Title VII of the Civil Rights Act (42 U.S.C. § 2000e et seq.) .

146.     Through the course of conduct alleged above, Plaintiff was subjected to a continuous hostile work environment and retaliation against her.

147.     Had Defendant Stony Brook University properly protected Plaintiff from the continuous hostile work environment or not retaliated against her, she would have continued working at Stony Brook University rather than be forced to resign.

148.     Plaintiff was intentionally subjected to an objectively intolerable working environment that forced her to resign early and involuntarily. The act was a result of the culmination of a concerted effort on the part of Stony Brook University to force her departure. Plaintiff, along with any reasonable person, would have found the aforementioned acts to be so intolerable that they would feel compelled to resign early and leave employment with Stony Brook University.

149.     As a direct and proximate result of Defendants Reeves and Caglioti's unconstitutional conduct, Plaintiff has sustained and will sustain economic injury in the form of loss of wages, loss of benefits, irreparable damage to her reputation, severe emotional distress, loss of consortium, mental health problems and legal expenses to date, which all have cause permanent economic injury to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grants judgment against Defendant as follows:

a.  Preliminarily and permanently enjoining Defendants from discriminating and retaliating against Plaintiff and other Defendant employees;

b.  Declaring that Defendant Stony Brook's actions and practices violated Title VII of the Civil Rights Act;

c.  Declaring that the Individual Defendants' conduct violated NYSHRL

d.  An award in Plaintiff's favor for back pay, front pay, compensatory damages, loss of earnings, and loss of professional opportunities in an amount to be determined at trial;

e.  An award of special and punitive damages in an amount to be determined at trial;

f.  An award of prejudgment and post-judgment interest as allowed by law;

g.  Assessing civil fines and penalties pursuant to the New York State Human Rights Law §297.

h.  An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

i.  Granting such other and further relief as this Court deems just and proper.

## **<u>JURY DEMAND</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues.


Dated:   Melville, New York
          June 24, 2021


                                        By: _____/s/Aneeba Rehman_____
                                             Aneeba Rehman  (AR-6404)

Nadia M. Pervez (NP-5388)
*Attorneys for PLAINTIFF*
Pervez & Rehman, P.C.
68 South Service Road, Suite 100
Melville, NY 11747
Tel: (631) 427-0700
 arehman@pervezrehman.com
 npervez@pervezrehman.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EMILY GILBERT,

                        PLAINTIFF,                        **Docket No.: 21-CV-2273**
                                                                        (BMC)

                     -against-                         **FIRST AMENDED**
                                                                       **COMPLAINT**

STONY BROOK UNIVERSITY, ROBERT
REEVES in his individual and official capacity as
Associate Provost of Southampton Arts, CARLA CAGLIOTI
in her individual and official capacity as Executive Director of
Southampton Arts, and MAURIE MCINNIS, in her individual
and official capacity as President of Stony Brook University,

                        DEFENDANTS,

-----------------------------------------------------------------X

<div align="center">

**VERIFICATION**

</div>

STATE OF NEW YORK      )
                                 ss.:
COUNTY OF SUFFOLK    )

I, EMILY GILBERT, am the Plaintiff in the within action. I have read the foregoing Amended
Complaint and know the contents thereof. The contents are true to her  own knowledge except as
to matters therein stated to be alleged upon information and belief, and as to those matters I believe
them to be true.

                                                      EMILY GILBERT

Sworn to before me on this _23 RD_ day
of _June_ , 2021.

_Mary E. Croghan_
/ Notary Public

<div align="center" style="border:1px solid black;">

MARY E. CROGHAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CR6095486
Qualified in Suffolk County
Commission Expires July 14, 20 23

</div>