UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                   :

EMILY GILBERT,                            :

                           Plaintiff,     :

                                     :

        - against -              :

                                     :

STONY BROOK UNIVERSITY, ROBERT  :
REEVES in his individual and official  :
capacity, CARLA CAGLIOTI in her  :
individual and official capacity, and  :
MAURIE MCINNIS, in her individual and  :
official capacity,                    :

                                   :

                    Defendants.     :

                                   :
------------------------------------------------------------ X

**MEMORANDUM DECISION
AND ORDER**

21-cv-2273 (BMC)

**COGAN**, District Judge.

       Plaintiff Emily Gilbert, a former employee of Stony Brook University ("SBU"), brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000c et seq. ("Title VII"), 42 U.S.C. § 1983, and the New York State Human Rights Law ("NYSHRL") against SBU, her two supervisors – Robert Reeves and Carla Caglioti – and Maurie McInnis, the President of SBU.  Gilbert alleges that defendants created a hostile work environment, subjected her to discrimination based on her sex, retaliated against her for both making complaints and exercising her right to free speech, and constructively terminated her.

       Defendants have moved to dismiss her Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons detailed below, their motion is GRANTED.

## BACKGROUND

### I.  Gilbert's Employment with SBU

Gilbert first became affiliated with SBU in 2013, when she enrolled as a graduate student in the university's Master of Fine Arts program in Creative Writing & Literature (the "MFA program").  In 2014 she also became an employee of SBU, taking on various administrative and academic roles over the years.  Most relevantly, Gilbert was hired as an editorial assistant for The Southampton Review ("TSR"), the literary journal of SBU Southampton's MFA program. She worked at TSR from 2014 until her resignation on December 31, 2020, rising first to managing editor, before eventually becoming Editor-in-Chief ("EIC") of the publication in 2018.

As EIC, Gilbert reported to Carla Caglioti, her direct supervisor, as well as TSR's publisher, Robert Reeves.  Prior to the events that gave rise to this lawsuit, Gilbert alleges that she had very limited oversight and was given a great deal of autonomy in running TSR.  As EIC, Gilbert understood her job duties to include, among others, the following tasks: soliciting, accepting, and editing work; collaborating and corresponding with other editors and contributors; organizing conferences; planning and executing issue launches; overseeing TSR's social media accounts; and tracking subscriptions and orders.  She also taught a practicum on publishing and editing for the MFA program.

### II.  Gilbert Removes Nick Flynn's Poem

On June 19, 2020, Gilbert noticed that some users on Twitter had begun circulating allegations concerning an author named Nick Flynn.  These users were accusing Flynn of "abusing his power and stature as an established writer to take advantage of women" and being "a known chauvinist."  Gilbert was familiar with Flynn as TSR had published one of his poems in its Winter/Spring 2019 issue, entitled "ON THE ANNIVERSARY OF MY MOTHER'S

SUICIDE MY DAUGHTER AND I TAKE THE C TRAIN TO THE MUSEUM OF NATURAL HISTORY."

Gilbert did not take issue with the content of the poem itself, which she herself had selected and chosen to publish.  Instead, she felt objectively and subjectively offended "by Flynn's publication because of how he allegedly treated females and non-binary people."  She does not contend that she investigated the factual accuracy of these allegations.  Regardless, she believed that TSR was compelled to respond by removing Flynn's poem from its digital archives.  Gilbert does not clarify if she ever had unilaterally removed another author's work previously, or if she properly had the authority to do so.  She does explain that she had deleted other content from the website without seeking approval, including staff photos and biographies.

It is unclear if she consulted with any of her colleagues before she deleted Flynn's poem, but she did consult with two of her colleagues about an official statement she wanted to make on behalf of TSR, supporting those speaking out against Flynn.  Cornelius Eady, TSR's male Poetry Editor, was supportive of the statement, but Amy Hempel, TSR's Fiction Editor, was not.

Given the lack of consensus regarding an official statement, Gilbert decided to post a statement to her personal Twitter account on June 26, 2020.  Before posting, she showed drafts of these tweets to Hempel.  Gilbert's statement consisted of three tweets that read:

> As editor of the Southampton Review, I published one of Nick Flynn's poems.  I've recently learned about the allegations of misconduct against him.  I believe those who speak out against people in positions of power do so at unknowable cost. They must be supported.  Nick Flynn's poem has been removed from The Southampton Review's website.  I take full responsibility for this decision.

On June 28, 2020, two days after Gilbert tweeted and removed Flynn's poem, Hempel resigned as Fiction Editor of TSR.  She stated that she felt the need to do so because of the perceived connection between herself, TSR, and Gilbert's tweets.

III.     **Gilbert Faces Hostile Work Environment**

After Gilbert removed the poem, she claims that she was immediately subjected to a hostile work environment due to defendants' alleged support of Flynn.  She alleges that this environment was "created by Flynn" but was "allowed to fester because of Reeve's inability or refusal to protect [her] from Flynn's email tantrums."

The email tantrum to which she refers consisted of emails Flynn sent to Gilbert and Reeves on July 11, 2020 regarding the removal of his poem and her tweets.[1]  She noted she felt that these emails were "a retaliatory tactic both because of the substance of the email" and the fact that she was only copied, whereas Reeves was the main recipient.  In his first e-mail, Flynn requested that "the both of you . . . reconsider pulling my poem from TSR."  He noted that his employer, the University of Houston ("UH"), had already "fully investigated" the allegations that had led to Gilbert's tweets, and found them "to have no merit."  He welcomed them to contact the chair of the English department at UH, providing an e-mail address to do so.  Flynn also said that he "fully understand[s] the need to take credible allegations of abuse seriously, yet a formal investigation . . . did not find [the] allegations credible."

Gilbert responded to his first e-mail.  She said that she understood "why you emailed Robert Reeves, my boss" but hoped that Flynn understood "that he did not play a part in the decision to remove your poem from the website. As I stated in my tweets, that decision was my responsibility alone."  Flynn responded by noting that he "would have appreciated if you had

---

[1] Although Gilbert relies on and describes these e-mails extensively in her Amended Complaint, she does not attach copies to it.  Defendants have provided these e-mails as well as other documents Gilbert has possession of and relies upon in her complaint, including her Letter of Accountability, e-mails she sent to Reeves about the letter, a counseling memo, and her response to the counseling memo.  The Court may properly rely on these documents in considering defendants' motion.  See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) ("documents either in plaintiff[']s possession or of which plaintiff[] had knowledge and relied in bringing suit" may be considered in determining a motion to dismiss).

done what seems basic due diligence as an editor and asked a few basic questions before making

your extremely harmful decision, which despite your assertion was most certainly done in the

name of TSR."  He asked if she would be willing to reconsider, and sent a subsequent e-mail

with his phone number, noting that he was open to discussing the issue by phone.  A few hours

later, without further response, he let Gilbert know that he had talked to Reeves on the phone,

and that Reeves said he would "clear this up."

## IV.    Gilbert Submits Letter of Accountability

On July 2, 2020, Gilbert met with Reeves to discuss the incident.  During the meeting,

Reeves requested a narrative from her as part of initiating a process to "review TSR policies and

protocols."  She agreed and stated that she was "looking forward to figuring out a process with

everyone."

On July 13, 2020, two days after Flynn's aforementioned e-mails, Gilbert e-mailed

Reeves to inform him that she would begin working on the narrative he requested shortly.  She

also said she would be happy to meet with him if he could provide a convenient time.  Reeves

replied that they could set up a time to talk after she had submitted her thoughts, which he was

eager to hear.  Further, he noted that "[n]ot knowing the facts puts me at a significant

disadvantage, especially when I get emails from outside."  She agreed to get him her "remarks by

Thursday afternoon."

On July 16, 2020, Gilbert submitted what she entitled her "Letter of Accountability" to

Reeves.  In a cover e-mail, she explained that the letter "outlines my decision regarding Nick

Flynn, what led me to make the decision I did, and suggestions for where to go from here."

Some of her suggestions included "agree[ing] upon policies for how to respond if a contributor

has been accused or convicted of causing harm."  She also indicated that she "would like to have

a better idea of what editorial decisions are appropriate for me to make independent of a collective."

In addition to discussing suggestions for moving forward, she "outline[d] some of the troubling things that have happened to me or that I've been told about" at SBU, some of which she also detailed in her Amended Complaint.[2]  Most of these incidents took place prior to or during her time as a student at SBU, although she does not provide dates for any of the incidents. For example, she recalled an incident in which one of her male professors negatively opined on the attractiveness of an actress he thought was "fat" during a class in which she was enrolled.  A few of these incidents allegedly occurred while she was an employee.  She alleges that a male faculty member made comments about her appearance and would stand too close to her.  She also recounted that a senior faculty member once said "in a joking" manner during a meeting with other faculty members that Gilbert should "stop stuffing her face" because they would "love to her [sic] what she thinks."  However, Gilbert also acknowledged in her letter that "none" of the incidents, "with the exception of perhaps one or two that may rise to the level of a Title IX offense . . . involve illegal behavior."  She similarly alleged in her Amended Complaint that she "recognizes that most of the abovementioned behavior, taken individually, may not be necessarily discriminatory," but felt that "it demonstrates the culture of TSR and SBU."

Reeves responded to her letter the following day, acknowledging his desire to develop a decision-making process and policy regarding "archive management" and that he would assemble an advisory committee to develop further policy.  He also emphasized that Gilbert had

---

[2] All of the examples included in this paragraph may be found in both Gilbert's Amended Complaint and her Letter of Accountability.

made it difficult for him to defend the program because she did not keep him in the loop when making her decisions to pull the poem and post on Twitter.

On July 21, 2020, Gilbert met with Reeves and Caglioti to discuss her letter.  They advised her that she should be careful about what she posts on her personal Twitter, but they did not actually discuss any of the complaints she allegedly raised.

She met with them again on August 18, 2020.  At that meeting, Gilbert received a counseling memorandum drafted by both Reeves and Caglioti.  The memo was to be added to her file due to her "decision to remove previously published work from TSR and to revise TSR's Letter of Agreement," which they had learned she had done without consulting faculty.  The memo noted that Gilbert had always been required to consult with faculty and leadership on the "development and implementation of editorial policies and decisions that determine the basic identity of the magazine," and her decision to "pull previously published work from the TSR digital archive . . . was not yours to make."  Further, her decision "had the immediate and unfortunate consequence of TSR's fiction editor stepping down" and "left program leadership unprepared to respond to the inevitable challenges to an action that generates significant disagreement in the literary community."  The memo went on to clarify that they needed "to come to an understanding of the levels of consultation and communication required by your position."

Defendants also stated that they would "restore the Flynn poem to the digital archive and remove the added language from the Letter Agreement."  Notably, this was only a temporary measure, "[p]ending the review and establishment of guiding policy."  Flynn's poem was ultimately reposted to TSR's website.  Although Gilbert had wanted to include an Editor's Note, none was added.

Finally, defendants confirmed in the memo that they wanted to "continue to work together [with Gilbert] to ensure the continuing success of TSR."  Gilbert responded to the memo by e-mail on August 27, 2020, "affirm[ing] my willingness to work collaboratively and transparently with program leadership and other faculty."

## V.    Retaliation

Gilbert believed that Reeves was unhappy with her Letter of Accountability.  She recalls he stated that he did not expect or want a "big document," and that he and Caglioti seemed to have no interest in addressing the complaints she raised both in the letter or verbally.  Reeves and Caglioti informed her that they were unable to discuss the contents of her complaint further, and that it was with the President of SBU.  Gilbert contends that no further action was taken concerning her complaints contained in the letter.

Instead, she alleges that she began facing retaliation on July 27, 2020 for writing the letter.  At that point in time, Reeves and Caglioti began to micromanage many aspects of her job, limiting the broad discretion they had previously given her by requiring that she get approval from them before she made even minor decisions.  The retaliation took many forms, including being assigned "busywork tasks", being told that some of her e-mails were "unprofessional," being required to attend frequent meetings with faculty, and having a faculty advisor assigned to supervise her teaching of the practicum.  Further, Reeves and Caglioti also made the decision to cancel publication of TSR Winter/Spring 2021 Issue due to budgetary concerns, which Gilbert alleges were pretextual.

Gilbert sought to redress these issues with her union and SBU.  On July 17, 2020, she first contacted her union representative who connected her with the Chair of the Academic Grievance Committee, Josh Dabnau.  Ultimately, Dabnau informed her that "[while] what they

are doing is unpleasant, [it] does not rise to the level of 'disciplinary action.'"  Dabnau also

brought the situation to Labor Relations on her behalf, but Labor Relations also deemed her

situation to not be a violation.  Gilbert then tried to file a formal complaint directly with Labor

Relations but was informed that the Office of Equity & Access was better suited to handle her

complaint.  It is unclear from her Amended Complaint whether she contacted this office.

Ultimately, Gilbert felt that she could no longer handle the stress associated with the

alleged retaliation and decided that her only option was to quit.  She contends that she was

constructively discharged by SBU on December 31, 2020.

Shortly after her resignation, she filed with the Equal Employment Opportunity

Commission on January 7, 2021.  After receiving her Right to Sue letter, she timely filed her

complaint in the instant action on April 26, 2021.

## DISCUSSION

### I.    Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a

complaint for failure to state a claim upon which relief can be granted.  In deciding a motion

under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accept[ ] all factual

allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor."

Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017) (quoting Chase Grp. All. LLC v.

City of New York Dep't of Fin., 620 F.3d 146, 150 (2d Cir. 2010)).  To survive a motion to

dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its

face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and to "allow[ ] the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009).  Determining whether a complaint states a plausible claim for

relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

"In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). "When determining the sufficiency of plaintiff['s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in [the] complaint, documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

## II.   Sex Discrimination Under Title VII, § 1983, and the NYSHRL

Gilbert alleges that defendants discriminated against her because of her sex in violation of Title VII, § 1983, and the NYSHRL by subjecting her to discriminatory treatment and a hostile work environment.[3]  It is not entirely clear where her disparate treatment claims end and her hostile work environment claims begin, but all of her discrimination claims fail for the same reason: she has failed to plausibly allege that any of defendants' actions had anything to do with her membership in a protected class.

### A.   Disparate Treatment

To survive a motion to dismiss on a sex discrimination claim, a plaintiff must "plausibly allege that (1) [her] employer took adverse action against [her] and (2) [her sex] was a

---

[3] Gilbert brings her Title VII claims against SBU and her Section 1983 and NYSHRL claims against each of the individual defendants.

motivating factor in the employment decision." <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801

F.3d 72, 86 (2d Cir. 2015).[4]

A plaintiff plausibly alleges an adverse employment action if she "endures a materially

adverse change in the terms and conditions of employment" that is "more disruptive than a mere

inconvenience or an alteration of job responsibilities." <u>Raspardo v. Carlone</u>, 770 F.3d 97, 125-

26 (2d Cir. 2014) (internal quotations omitted).  Examples include "termination of employment,

a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices . . . unique to a

particular situation." <u>Feingold v. New York</u>, 366 F.3d 138, 152 (2d Cir. 2004) (quotations

omitted).

Gilbert alleges that she suffered a variety of what she contends are materially adverse

employment actions, including that defendants micromanaged her, stripped her of certain job

duties and functions through increased supervision, prevented her from accepting work for the

forthcoming issue of the journal due to the issue's cancellation, and constructively terminated

her.  At the outset, many of these allegations cannot legally rise to the level of materially adverse

employment actions as they do not alter the terms and conditions of her employment.

Importantly, Gilbert was never demoted, she does not allege any change in renumeration, and her

responsibilities themselves do not appear to have significantly changed, even if she was

subjected to increased supervision.  <u>See, e.g.</u>, <u>Costello v. New York State Nurses Ass'n</u>, 783 F.

Supp. 2d 656, 677–78 (S.D.N.Y. 2011) (micromanagement does not qualify as an adverse

---

[4] Gilbert's claims under Title VII, Section 1983, and the NYSHRL are all analyzed under the same standard.  <u>Reyes v. Westchester Cty. Health Care Corp.</u>, No. 21-0410, 2021 WL 4944285, at *2 (2d Cir. Oct. 25, 2021); <u>Sosa v. New York City Dep't of Educ.</u>, 368 F. Supp. 3d 489, 521 (E.D.N.Y. 2019).

employment action where the plaintiff "suffered no demotion, material loss of benefits, or

significantly diminished material responsibilities").

More importantly, even if some of these actions rose to the level of adverse employment

actions, she has failed to plead any nonconclusory or plausible facts to suggest that defendants

were motivated to take these actions *because of* her sex.  "[I]t is axiomatic that mistreatment at

work . . . is actionable under Title VII only when it occurs because of an employee's sex."

Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (quoting Brown v. Henderson, 257 F.3d 246,

252 (2d Cir. 2001)).  To demonstrate that sex was a motivating factor at the motion to dismiss

stage, a plaintiff must either plead facts that "directly show discrimination or facts that indirectly

show discrimination by giving rise to a plausible inference of discrimination."  Vega, 801 F.3d at

87.  An inference of discrimination can arise from circumstances including, but not limited to, an

employer's "invidious comments about others in the employee's protected group; or the more

favorable treatment of employees not in the protected group; or the sequence of events leading to

the plaintiff's discharge."  Littlejohn v. City of N.Y., 795 F.3d 297, 312 (2d Cir. 2015) (internal

quotations omitted).  A plaintiff may also prove discrimination by "creating a mosaic of

intentional discrimination by identifying bits and pieces of evidence that together give rise to an

inference of discrimination."  Vega, 801 F.3d at 87 (internal quotations omitted).  Whatever

allegations a plaintiff relies on to support her discrimination claim, the Second Circuit has made

clear that "at the initial stage of a litigation, the plaintiff's burden is minimal – [she] need only

plausibly allege facts that provide at least minimal support for the proposition that the employer

was motivated by discriminatory intent."  Id. (internal quotations omitted).

Gilbert relies on multiple allegations to support her claim that defendants' actions were

motivated by discriminatory intent.  First, she points to a series of incidents of intentional

discrimination she faced during her time at SBU.  However, most of these incidents, even if they are legally cognizable as discriminatory, occurred when she was a student and are not actionable under Title VII.  See 42 U.S.C. § 2000e-2(a)(1) (prohibiting only "unlawful employment practices").  While she was an employee at SBU, she does allege that she "was exposed to an instance where a male faculty member made unwelcome comments about her appearance and would consistently stand too close to her," as well as another incident when a faculty member made a comment on her eating habits.  However, "Title VII does not establish a general civility code for the American workplace," Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004) (internal quotations omitted), and a few uncomfortable, isolated incidents are not enough to state a claim alone or when paired with her other allegations.  Further, she cannot state a claim against any of the individual defendants based on allegations concerning unnamed actors occurring on unspecified dates.  Raspardo, 770 F.3d at 115 ("If a defendant has not personally violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant.").

Additionally, Gilbert's allegation that defendants' "unyielding" support of Flynn is clear evidence "that Defendants have a bias against women that speak up for women and non-binary people's rights" is also unavailing.  This is a wholly conclusory statement and courts are "not required to credit conclusory allegations or legal conclusions couched as factual allegations." Rothstein v. UBS AG, 708 F.3d 82, 94 (2d Cir. 2013); see also Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 470 (2d Cir. 2006) (affirming dismissal where the "complaint proffer[ed] only a conclusory allegation of discrimination").

Next, Gilbert contends that defendants treated "[o]ther male employees similarly situated" more favorably.  However, "[t]o establish an inference of discrimination" based on

disparate treatment of similarly-situated employees, "a plaintiff must allege that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." Brown v. Daikin Am. Inc., 756 F.3d 219, 230 (2d Cir. 2014) (internal quotations omitted). Other than one conclusory reference to "[o]ther male employees," she does not identify any specific male employees, let alone compare herself to them. See Goodine v. Suffolk Cty. Water Auth., No. 14-cv-4514, 2017 WL 1232504, at *4 (E.D.N.Y. Mar. 31, 2017) (a plaintiff must "identify at least one comparator to support a minimal inference of discrimination; otherwise the motion to dismiss stage would be too easy to bypass.").

Any comparisons she makes between how she and Flynn are treated are not sufficient. Flynn was not employed by the TSR or SBU. Therefore, he is not "similarly situated" to Gilbert at all, much less "in all material respects."

Finally, Gilbert argues that defendants' discriminatory intent can be inferred from their policies. To prevail under the disparate impact theory of liability, a plaintiff must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 151 (2d Cir. 2012). Gilbert identifies defendants' alleged practice or policy of ignoring complaints of workplace misconduct by women.

Here too she does not succeed. She offers nothing more than her own experience with her Letter of Accountability as indicative of this "policy." Moreover, her own statements belie her allegations. She concedes that defendants reviewed her letter and told her that her letter was being addressed, although perhaps not in the manner of or with the speed at which she wished. Comparing how defendants addressed Flynn's complaint regarding his poem also does not

bolster her claim, as again he is not an employee and did not complain of "workplace misconduct."

Perhaps most importantly, nothing suggests that her Letter of Accountability, even if it had been ignored, was ignored because of her sex.  See also Amaya v. Ballyshear LLC, 295 F. Supp. 3d 204, 220 (E.D.N.Y. 2018) ("[n]aked assertions of discrimination without any specific factual allegation of a causal link between the defendants' conduct and the plaintiff's protected characteristic are too conclusory to withstand a motion to dismiss.").  More plausibly, defendants did not immediately act because they determined, as did her union and Labor Relations, that there was no violation.

### B.      Hostile Work Environment

Gilbert's claim that she was subjected to a hostile work environment based on her sex also fails.  "To state a claim for a hostile work environment in violation of Title VII [or Section 1983], a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive – [that it] creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex."  Patane, 508 F.3d at 113 (internal quotations omitted).  To show that conduct was objectively severe or pervasive, a plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotations omitted).  "In determining whether a plaintiff suffered a hostile work environment, we must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." Littlejohn, 795 F.3d at 321.

"Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" Patane, 508 F.3d at 113 (quoting Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)). A plaintiff may rely on evidence of discriminatory conduct, even if it was not aimed at her. McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 85 (2d Cir. 2010) (the court could consider comments that were not directed to or about the plaintiff "but also contributed to a work environment that was hostile to women.").

Notably, the standard is somewhat lower under the NYSHRL. Under the NYSHRL, a "plaintiff need not show that the treatment was severe or pervasive but must only show unequal treatment based upon membership in a protected class." Fattoruso v. Hilton Grand Vacations Co., 873 F. Supp. 2d 569, 579 (S.D.N.Y. 2012).

Gilbert contends that defendants' publication of Flynn's poem demonstrated support for offensive conduct against women, which she argues "is both subjectively and objectively offensive and creates a hostile work environment." Although the Court credits her subjective belief that she found this offensive, she does not plausibly plead any non-conclusory facts that suggest a "reasonable person" would feel similarly. The allegations, in fact, point in the other direction, as one of Gilbert's female colleagues, Amy Hempel, definitively did not agree.

Importantly, Gilbert does not suggest that the poem itself is objectively offensive, nor can she in good faith because she was the one who selected it. She also cannot credibly suggest that this single incidence of publication created a hostile environment because of her sex. Her

16

attempts to analogize its presence to that of pornography in the workplace are unavailing; unsubstantiated allegations concerning the author of a poem cannot transform a neutral work into something objectively offensive and discriminatory. To hold otherwise would result in a substantial portion of cultural works being cancelled.

Gilbert alleges that a hostile workplace was created when "she was bombarded with discriminatory emails, questioning her authority, competence, and her support for women and non-binary people" which her male boss promised to "smooth over." This too is insufficient to be considered hostile, abusive, or even evidence of unequal treatment. For one thing, Gilbert's characterization of these emails is inaccurate. Flynn sent her five e-mails over a single one-day period, one of which Gilbert responded to. Flynn was clearly upset that his poem was removed, noting that he "would have appreciated if you had done basic due diligence as an editor and asked a few basic questions before making your extremely harmful decision." However, his e-mail was objectively polite and professional. Any perceived questioning of her authority or competence went not to her gender, but to her decision to remove his poems without investigation. Having to deal with a few emails from a disgruntled contributor without her employer defending her does not create a hostile work environment, even if Flynn's remarks had been unfairly critical. See Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 119 (2d Cir. 2010) (no hostile work environment when supervisor wrongly excluded plaintiff from meetings, excessively criticized plaintiff's work, refused to answer work-related questions, imposed duties outside plaintiff's responsibilities, threw books, and sent insulting e-mails).

Taken together, these allegations cannot support a finding of a hostile work environment that is so severe or pervasive as to have altered the conditions of Gilbert's employment under Title VII or Section 1983. Further, even under the less burdensome standard of the NYSHRL, an

actionable hostile work environment claim must include non-conclusory allegations establishing that the hostile work environment was created because of the plaintiff's protected class.  As there are no such allegations, Gilbert's claims are dismissed.

## III.   Retaliation Under Title VII, § 1983, and the NYSHRL

To present a *prima facie* case of retaliation, a plaintiff must ultimately adduce evidence sufficient to permit a rational trier of fact to find: "[1] that she engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action."  Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotations omitted).  However, for a retaliation claim to survive a motion to dismiss, a plaintiff need only "plausibly allege that: (1) defendants discriminated – or took an adverse employment action – against [her], (2) because [s]he has opposed any unlawful employment practice."  Vega, 801 F.3d at 90 (internal quotations omitted).[5]

An adverse employment action in the context of a retaliation claim "covers a broader range of conduct than does the adverse-action standard for claims of discrimination," and is therefore "not limited to discriminatory actions that affect the terms and conditions of employment."  Vega, 801 F.3d at 90.  An adverse employment action in this context includes any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).

---

[5] Retaliation claims under Title VII are subject to the same standards as those under § 1983.  Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013); Sosa v. New York City Dep't of Educ., 368 F. Supp. 3d 489, 521 (E.D.N.Y. 2019) (citing Littlejohn, 795 F.3d at 315).

Under this broader standard, some of Gilbert's allegations, taken as true, may rise to the level of an adverse employment action.  However, her claims fail for another reason: Gilbert has failed to allege that she engaged in protected activity that proximately caused retaliation.

Defendants argue that Gilbert's Letter of Accountability was not "protected activity" since it was not a complaint, but merely a narrative response that Reeves had requested.  Even if this characterization is accurate, her verbal follow-ups certainly might constitute protected activity.  However, these complaints, both written and verbal, are not protected activity for a different reason – she herself overtly stated that she did not believe defendants had violated any workplace protection law.  See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 16 (2d Cir. 2013) (quotations and brackets omitted).  Although a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful", the plaintiff must still be able to "establish that she possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law."  Id.

In her Letter of Accountability, Gilbert expressly caveated that almost none of the incidents she outlined "involve illegal behavior," and the one or two that might would only potentially amount to violations of Title IX.  Instead, she explains that she sought to catalog "abuse[s] of power, however slight."  Given this statement, she cannot reasonably argue that she believed that the "underlying challenged actions" here violated workplace protection laws or that her employer understood her allegations that way.  See Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) (citation omitted) (a plaintiff's complaint cannot have been so generalized that the employer "could not reasonably have understood that she was complaining of conduct prohibited by Title VII."); Kelly, 716 F.3d at 15 ("A plaintiff's belief on

this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form.").

Nor does Gilbert plausibly allege that defendants' retaliatory actions were caused by her complaints. "Ordinarily, causation may be inferred from close temporal proximity." Chung v. City Univ. of New York, 605 F. App'x 20, 23 (2d Cir. 2015). However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001).

In her Amended Complaint, Gilbert alleges that the retaliatory actions began after she engaged in the protected activity of submitting her Letter of Accountability.[6]  However, weeks before she did so, Reeves put her on notice and started the process of reevaluating the level of supervision she received by meeting with her and requesting that she write a narrative.  Any delay in instituting these changes then appears to be due to Reeves' desire to review Gilbert's narrative and meet with her before making changes.  As defendants' allegedly retaliatory actions began prior to the alleged protected activity, Gilbert has not sufficiently stated a claim for retaliation.

## IV.   First Amendment Retaliation

Gilbert also fails to state a claim that the individual defendants retaliated against her for her June 26, 2020 tweets, violating her right to free speech.

To state a First Amendment retaliation claim, a plaintiff must plausibly allege that: "(1) [her] speech or conduct was protected by the First Amendment; (2) the defendant took an

---

[6] In her opposition to the motion, Gilbert seems to argue that her removal of Flynn's poem could be construed as the protected activity, and thus that she adequately alleged causation.  However, removing Flynn's poem could not be reasonably be understood by defendants as a complaint concerning unlawful workplace conduct.

adverse action against [her]; and (3) there was a causal connection between this adverse action and the protected speech." Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011). As Gilbert is a public employee, for her speech or conduct to be protected by the First Amendment, she must have spoken in her role as a citizen on a matter of public concern rather than as a public employee. See, e.g., Montero v. City of Yonkers, New York, 890 F.3d 386, 397 (2d Cir. 2018).

Gilbert clearly spoke on a matter of public concern. See Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011) (internal quotations omitted) ("To constitute speech on a matter of public concern, an employee's expression must be fairly considered as relating to any matter of political, social, or other concern to the community"). The question then becomes whether she spoke as a citizen or a public employee. Here, the Second Circuit has "identified two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether the speech fall[s] outside of the employee's official responsibilities, and (2) whether a civilian analogue exist[s]." Montero, 890 F.3d at 397 (2d Cir. 2018).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). Further, where speech or conduct "owes its existence" to the employee's job duties, or is of the sort that is derived from special knowledge resulting from the speaker's employment, it is more likely that the speech was made as an employee than as a citizen. Taylor v. New York City Dep't of Educ., No. 11-cv-7833, 2012 WL 3890599, at *3, *5, *7 (S.D.N.Y. Sept. 6, 2012).

Whether Gilbert spoke as a citizen is a close issue. Part of the problem is that her tweets, in announcing her removal of Flynn's poem from TSR's digital archives, necessarily incorporate

this underlying conduct.  Gilbert's removal of the poem from TSR's website in protest of misogyny is plainly expressive conduct that is protectable under the First Amendment.  See Texas v. Johnson, 491 U.S. 397, 404 (1989) (burning a flag in protest is expressive conduct protected under the First Amendment).  She intended to "convey a particularized message" and, with the context provided by her tweets, it was extremely likely that "the message would be understood by those who viewed it."  Id.

However, the First Amendment does not provide protection for Gilbert's removal of the poem as this action was unavoidably pursuant to her duties as a public employee.  Even though her supervisors may contest whether unilaterally removing poetry was or should have been within her job duties, she was only able to perform this action because of her position.  See Weintraub v. Bd. of Educ., 593 F.3d 196, 203 (2d Cir. 2010) ( "[s]peech can be 'pursuant to' a public employee's official job duties even though it is not required by or included in that employee's job description.").

The tweets themselves pose a slightly more complex question.  But reviewing their content makes it clear that they cannot be viewed separately from her underlying expressive conduct and role at TSR.  If she had merely tweeted her support for Flynn's accusers from her personal account without referencing TSR or reached out to them privately as she considered doing, she would be speaking as a citizen.  However, Gilbert took pains to connect her statements and actions to her position "[a]s editor of the Southampton Review."  She explains that she was the one who "published" his poem and "takes full responsibility" for its removal.  By her own admission, then, the removal of the poem was something for which she was responsible, and thus this is clearly connected to her duties as EIC.  Montero, 890 F.3d at 395 ("When a public employee speaks pursuant to [her] employment responsibilities . . . there is no

relevant analogue to speech by citizens who are not government employees.").  And, perhaps most importantly, without her tweets, her removal of Flynn's poem would have gone unnoticed. Necessarily, these acts are one instance of expressive conduct that is not protected by the First Amendment.

## V.     Constructive Discharge

Finally, Gilbert's claim for constructive discharge under Title VII against SBU must be dismissed for reasons similar to those stated above.  Gilbert alleges that she was constructively discharged in violation of Title VII when she resigned from TSR on December 31, 2020 because she "clearly had no other option but to quit after her responsibilities were severely curtailed after engaging in a protected activity in removing the Nick Flynn poem."

To state a constructive discharge claim under Title VII, a plaintiff must allege that "[she] was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign."  Green v. Brennan, 578 U.S. 547, 555 (2016). "[A] constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of her assignments or criticism of her work, or where the employee found the working conditions merely difficult or unpleasant."  Green v. Town of E. Haven, 952 F.3d 394, 404 (2d Cir. 2020) (internal quotations omitted).  Rather, "[a] constructive discharge occurs when an employer 'intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.'"  Borski v. Staten Island Rapid Transit, 413 F. App'x 409, 411 (2d Cir. 2011) (quoting Terry, 336 F.3d at 151-52).

To the extent Gilbert was unhappy with any increased supervision, micromanagement, busywork, or meetings, "such dissatisfaction does not, by itself, support a constructive discharge

claim." <u>Porter v. Half Hollow Hills Cent. Sch. Dist.</u>, No. 17-cv-5006, 2019 WL 4696384, at *7 (E.D.N.Y. Sept. 26, 2019).

Moreover, the operative "standard is higher than the standard for establishing a hostile work environment." <u>Fincher v. Depository Trust and Clearing Corp.</u>, 604 F.3d 712, 725 (2d Cir. 2010) (reasoning that because the plaintiff did not establish a hostile work environment, "her claim of constructive discharge also fails"). As Gilbert has not pled sufficient facts to establish that a hostile work environment existed, her constructive discharge claim also fails.

## CONCLUSION

Defendants' motion to dismiss the amended complaint is GRANTED.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
                                  U.S.D.J.

Dated: Brooklyn, New York
       February 9, 2022

24